**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Sidney ROSENSTEIN et al., Defendants-
Appellants.**

**Nos. 111, 112, Dockets 72–1092, 72–1190.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 14, 1972.

Decided Jan. 26, 1973.

James M. LaRossa, New York City (Gerald L. Shargel and Ronald P. Fischetti, New York City, on the brief), for defendants-appellants, Sidney Rosenstein and McInerney Sales, Inc.

Norman S. Ostrow, New York City (Royall, Koegel & Wells, James B. Weidner and James M. Ringer, New York City, of counsel), for defendants-appellants, Irving Braverman and Foremost Brands, Inc.

Gary P. Naftalis, Asst. U. S. Atty., New York City (Whitney North Seymour, Jr., U. S. Atty., S.D.N.Y. and Gerald A. Feffer and John W. Nields, Jr., Asst. U. S. Attys., New York City, of counsel), for plaintiff-appellee.

Before SMITH, KAUFMAN and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

These are appeals by Sidney Rosenstein, Irving Braverman, Foremost Brands, Inc. and McInerney Sales, Inc. from judgments of conviction entered in the United States District Court for the Southern District of New York on January 11, 1972 after trial before Hon. Thomas F. Croake, United States District Judge, and a jury. Judgments affirmed.

The Indictment filed on December 4, 1968 contained 13 counts. Count 1 charged all defendants with conspiracy to defraud the United States of federal income taxes and to commit offenses against the United States in willfully evading income taxes in violation of Title 26, United States Code, Section 7201 and in violation of Title 18, United States Code, Section 2, by aiding and abetting such violations. The balance of the counts were for substantive violations of these sections by the individual and corporate defendants. All were found guilty of the conspiracy counts and the applicable substantive counts. On January 11, 1972, Judge Croake imposed the following sentences:

Sidney Rosenstein, 18 months in prison concurrently on each count, a total fine of $100,000 plus one-half the cost of prosecution;

Irving Braverman, 18 months in prison concurrently on each count, a total fine of $100,000 plus one-half the cost of prosecution;

McInerney Sales, Inc. and Foremost Brands, Inc. were each fined a total of $40,000;

Rosenstein and Braverman are presently enlarged on bail and payment of fines and costs has been stayed pending appeal.

## I. THE FACTS

The investigation of this complicated case was commenced by Internal Revenue Service in 1964 and did not terminate until late in 1967. It involved interviewing a great number of witnesses in the United States as well as foreign nationals in Switzerland and Liechtenstein. In a trial which lasted six weeks, the Government presented some 75 witnesses and over 1000 documents as exhibits. The defendants did not testify.

The Government's proof established without any doubt that from May, 1960 until 1967 Braverman and Rosenstein and their wholly owned corporations, Foremost and McInerney, brazenly and fraudulently evaded United States income taxes by creating a dummy Liechtenstein corporation, called Continental Trade Establishment (CTE), to which they diverted payments of $1.6 million in commissions from October 1, 1961 to January 31, 1965 and which, in turn, were deposited in a secret account at the Bank Leu, Zurich, Switzerland.

Braverman and Rosenstein and their corporate alter egos, Foremost and McInerney, acted as sales representatives for American manufacturers in the sale of their products to United States Military Post Exchanges throughout the world. In return for their services, they received commissions of about 6% on gross sales. In May, 1960, Braverman and Rosenstein created CTE in Liechtenstein and opened an account at the Bank Leu in Zurich. Their American clients were then asked to make all commission checks on sales to overseas PX's payable to CTE and to forward them to Dr. Herbert Batliner, Haupstrasse 22, Vaduz, Liechtenstein, instead of to Foremost or McInerney, the previous payees. Sometime in 1966 the instructions were changed and the checks were forwarded to Dr. Alfred Buehler at the same Liechtenstein address. Batliner and Buehler were both Liechtenstein attorneys and Haupstrasse 22 was a two-story building which housed Batliner's law office and a shoe store. Representatives of 42 American manufacturers testified at trial as to the payment arrangements and the Government produced checks, payable to CTE and deposited in the Swiss Bank, totalling $1,604,409.59 for foreign PX commissions from October 1, 1961 through January 31, 1965. It is not disputed that no United States income taxes have ever been paid by the appellants on these commissions.

The evidence of the Government that CTE was utilized as a shell and a device for the appellants and was not in fact a viable operating entity, was overwhelming. A dozen American manufacturers were advised by Rosenstein, Braverman or their employees that CTE was actually their company. All the activities per-

formed by Rosenstein and Braverman prior to May, 1960, continued. The same cast of characters continued to travel to European PX's, displaying samples and catalogues and arranging appointments between buyers and sellers. PX representatives testified at trial and produced log books from Wiesbaden and Nuremberg, Germany, the buying centers for the military establishment where sales representatives were required to check in. This testimony and these documents establish that while Rosenstein and Braverman continued to appear for their American clients, no one ever heard of or met either Batliner or Buehler who apparently never appeared to represent their company. Only one of the 15 PX buyers who testified had even heard of CTE. Even more telling is the testimony of Peter Roussos and Robert Naar, exclusive resident representatives for Foremost in parts of Europe from 1960 to 1964. They testified that only Braverman and Rosenstein or themselves represented the 42 American manufacturers whose commission checks to CTE constitute the basis for this indictment. Neither was ever employed by CTE and in fact neither had ever heard of CTE. There is no indication that CTE ever performed any services. In fact there is evidence to establish that Braverman and Rosenstein had CTE stationery and cards printed. The correspondence and contracts, prepared on these letterheads, were signed by their employees, falsely identifying the employees as CTE officers. Rosenstein also directed that Batliner's signature be forged on these letters. When he learned of this, Batliner resigned as a CTE director to be replaced by Buehler. The evidence of the PX representatives, the American manufacturers and the employees of Foremost and McInerney, plus the obvious efforts of Rosenstein and Braverman to create an appearance of activity amply demonstrate the charade. The reading of a voluminous record compels the conclusion that CTE had only one function: it was the receptacle of the income earned by the appellants from their representation of American producers of goods sold to foreign post exchanges. It was created by the defendants in an elaborate but futile effort to avoid American income taxes.

The principal argument raised on appeal is that the admission into evidence of the records of CTE, Government Exhibits 1020–23 and 1025–29, constituted reversible error.

## II. THE LIECHTENSTEIN DOCUMENTS

a) *The Business Records Exception*

The exhibits in question were produced toward the close of its case, by a Government witness, Dr. Peter Monauni, one of three Liechtenstein attorneys resident at Haupstrasse 22, Vaduz, Liechtenstein. Dr. Batliner had refused to come to the United States at the time of the trial to testify. Instead he sent Dr. Monauni who had been associated with him for ten years. Dr. Monauni's direct testimony bolstered the other evidence in the case as to CTE's true character. He knew it simply as a client of his firm; to his knowledge it conducted no business of any description at the law office headquarters except for the forwarding of mail and checks.

Monauni produced a CTE file containing Exhibits 1020–23 and 1025–29. The Government offered the documents under the business records exception to the hearsay rule, 28 U.S.C. § 1732.[1] Essentially the statute provides

---

1. 28 U.S.C. § 1732 provides in pertinent part:

 (a) In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or

that any writing or record, made as a memorandum of any act, transaction, occurrence or event, if made in the ordinary course of one's business and if it was the regular course of such business to make such record at the time or reasonably thereafter, is admissible as evidence of the act, transaction, occurrence or event. We agree with the appellants that the documents were not properly admissible under the statutory business record exception. The fact that Dr. Monauni did not personally keep the books and records would not render them inadmissible (United States v. New York Foreign Trade Zone Operators, Inc., 304 F.2d 792, 796 (2d Cir. 1962)), but someone who is sufficiently familiar with the business practice must testify that these records were made as part of that practice. United States v. Delgado, 459 F.2d 471, 472 n. 5 (2d Cir. 1972); Cullen v. United States, 408 F.2d 1178 (8th Cir. 1969); United States v. Dawson, 400 F.2d 194, 198–199 (2d Cir. 1968), cert. denied, 393 U.S. 1023, 89 S. Ct. 632, 21 L.Ed. 567 (1969). Dr. Monauni's testimony did not rise to this level of requisite knowledge. He not only did not keep the records, he did not even know from his own personal knowledge that they were kept in Batliner's office. He did not testify to the business practice of CTE or that it was the practice to keep the documents which were introduced.

Some of the Liechtenstein documents were letters from third parties who clearly were not working for CTE. They "were not made in the regular course of the business of the company in whose files they were found . . . ." Phillips v. United States, 356 F.2d 297, 307 (9th Cir. 1965), cert. denied, 384 U.S. 952, 86 S.Ct. 1573, 16 L.Ed.2d 548 (1966). The requirements of the Business Records Rule are not fulfilled by a showing that the addressee routinely kept a file of such correspondence. It must appear that the letter was written in the regular course of its author's business. See Johnson v. Lutz, 253 N.Y. 124, 170 N.E. 517 (1930).

While the records were not admissible as business records, we cannot agree with the appellants' contention that we cannot sustain their admission on the basis of some other exception to the hearsay rule. The rule stated by Wigmore is "[a]n offer of a fact for an *inadmissible purpose* A is properly excluded, though the same fact would have been *admissible for purpose* B." 1 J. Wigmore, Evidence § 17, at 320 (3d ed. 1940) (emphasis in original, footnote omitted). (See People v. Zackowitz, 254 N.Y. 192, 200, 172 N.E. 466 (1930)).

The Government now urges that these documents are admissible either as admissions by the defendants or as declarations by conspirators, which like the Business Records Rule are further recognized exceptions to the hearsay rule. Here there is no difference in the *purpose* for which the evidence is sought to be admitted on the alternative grounds. The purpose of admission under any such exception is to establish the truth of that which is contained in the declaration which otherwise would be hearsay. This distinguishes Shepard v. United States, 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed. 196 (1933) and United States v. DeMasi, 445 F.2d 251 (2d Cir.), cert. denied, 404 U.S. 882, 92 S.Ct. 211, 30 L. Ed.2d 164 (1971), relied upon by appellants.

*Shepard* was a case in which an army officer had been accused of murdering his wife by adding bichloride of mercury to her liquor. There was testimony that the sick wife made the statement "Dr. Shepard has poisoned me." She also inquired if there was enough of the liquor

event or within a reasonable time thereafter.

All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.

The term "business," as used in this section, includes business, profession, occupation, and calling of every kind.

left to have tests made. These statements were offered as dying declarations, an exception to the hearsay rule. Since there was a lack of evidence that the declarant spoke without hope of recovery, the statements were held by the Supreme Court to be not admissible for their truth as dying declarations. The Government argued alternatively that the statements were admissible for a different *purpose*, to wit, they were admissible to rebut evidence of defendant's witnesses that the victim had suicidal tendencies since the statements indicated a will to live. The alternative *purpose* was clearly untenable since no limiting instructions had been given to alert the jury to the different *purpose* for which the evidence was offered. Had the conviction been sustained the prejudice to the defendant from the admission of the accusation now urged as simply indicative of a will to live and no more, is obvious. As Mr. Justice Cardozo observed in characteristic language "The reverberating clang of those accusatory words would drown all weaker sounds." Shepard v. United States, supra, 290 U.S. at 104, 54 S.Ct. at 25.

*DeMasi* is like unto *Shepard.* There the Government offered certain statements made by a decedent to two witnesses. The statements were offered for their truth as exceptions to the hearsay rule. On appeal this court found that the declarant was not a conspirator and his statements were inadmissible hearsay. The Government's alternate argument that the statements were admissible for another *purpose,* was rejected: "The Government's alternate theory to justify the admissibility of the declaration, that the statement was relevant to prove the victim's state of mind, was not suggested at trial, *and the court did not instruct the jury with reference to it*; therefore we will not

consider it." United States v. DeMasi, supra, 445 F.2d at 256 (emphasis added and footnote omitted).

 The situation we encounter here is clearly distinguishable. The alternative theories proposed are equally exceptions to the hearsay rule.[2] The Government is asserting that the documents are admissible for the *same purpose,* to establish the truth of what they say. No different or other limiting instruction to a jury was necessary no matter what the theory of admission. The prejudice of the lack of such instruction, so clear in *Shepard* and *DeMasi,* is not at all present here.

b) *Declarations of Co-Conspirators*

If the documents were admissible as declarations of a conspirator, appellants argue that the trial court would have had to find that the defendant's participation in the conspiracy had been established by a fair preponderance of the evidence *aliunde.* United States v. Geaney, 417 F.2d 1116, 1120 (2d Cir. 1969), cert. denied, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970); Levie, Hearsay and Conspiracy: A Reexamination of the Co-conspirators' Exception to the Hearsay Rule, 52 Mich.L.Rev. 1159, 1176–78 (1954); Developments in the Law—Criminal Conspiracy, 72 Harv.L. Rev. 922, 987 (1959).

 Since the documents were not offered as declarations of conspirators there was no occasion for Judge Croake to find on the record that each of the defendants was a member of the conspiracy. We believe that the evidence submitted by the Government prior to the admission of the disputed documents fully supported such a finding. The testimony of the representatives of the 42 American manufacturers clearly established by a fair preponderance of the evidence, the test here applicable, that

2. We note that the new Federal Rules of Evidence do not classify admissions or co-conspirators' declarations as *exceptions* to the hearsay rule, but rather as statements which are not hearsay. Fed.R. Evid. 801(d)(2). See United States

v. Puco, 476 F.2d 1099 n. 3 (2d Cir., 1973). In any event they are admissible to establish the truth of what is said. C. McCormick, Evidence § 239, at 503–04 (1954).

Braverman and Rosenstein had jointly contacted all of their American clients requesting that commission checks theretofore payable to either Foremost or McInerney be made payable to CTE. Moreover, representatives of Ideal Toy, North Shore Sportswear, Genesco, Leeds Travelwear, Burlington Industries, Tobin-Hamilton, National Togs, Blue Bell, Inc., Prince Gardner Wallets, Adler Company, and My Toy Company testified that Rosenstein, Braverman or their employees advised them that CTE was Braverman's and Rosenstein's company.[3] The testimony of PX employees that despite the 1960 change to CTE, the same personnel continued to represent Foremost and McInerney and that Batliner, Buehler and CTE were unknown to them, was further proof that CTE was a shell devised by the defendants to siphon off commissions. In addition to all of this, some of the documents which will be discussed later in this opinion were admissible in any event as admissions. The fact that some of these exhibits might have been admitted after the co-conspirator documents is not material since it is well established that the determination as to whether the prosecution has laid the foundation for the admission of the co-conspirator's state-ments can be made at the close of the Government's case. United States v. Geaney, *supra,* 417 F.2d at 1120; United States v. Sansone, 231 F.2d 887 (2d Cir.), cert. denied, 351 U.S. 987, 76 S.Ct. 1055, 100 L.Ed. 1500 (1956).

■ In our view Judge Croake could have properly made the determination that the Government had laid a proper foundation for the admission of these documents as statements of co-conspirators made in furtherance of this continuing scheme to defraud the United States of taxes. The fact is that he made no such ruling and none was requested. We nonetheless hold that this court can made the *post hoc* determination on appeal.

■ We should emphasize that the function of determining whether or not the proper foundation for the admission of these documents has been made is judicial and that the jury may not properly reassess the propriety of the court's determination.[4] United States v. Ragland, 375 F.2d 471, 478–479 (2d Cir. 1967), cert. denied, 390 U.S. 925, 88 S. Ct. 860, 19 L.Ed.2d 987 (1963); Carbo v. United States, 314 F.2d 718, 735–738 (9th Cir. 1968).

---

3. For example, Abe Kent and Miriam Gittleson, employees of the Ideal Toy Corporation, testified that defendant Rosenstein had called and requested that Rosenstein's commission checks be sent to CTE, the "subsidiary" corporation.

Rubin Bass, president of North Shore Sportswear, testified in part:

Q. . . . Just what did Azzaro (an employee of McInerney) say to you and what did you say to Mr. Azzaro?
A. To mail the checks overseas.
Q. What did he say?
A. This would cover his commissions to McInerney Sales.

. . . . .

Q. Do you recall whether or not Mr. Azzaro indicated anything about *the nature of who owned the companies* or who the companies were? . . . (Objections of defense counsel)
A. All he said is that all these companies are one and not to worry what name we make it out, it will cover the commissions. (Tr. 467)

Mr. Bass further testified that despite the payments to CTE, he continued to deal with the same people, Rosenstein and Azzaro, at McInerney. No one from Europe performed any services for him.

Francis Parker, an employee of Genesco, testified that his company's sales representative was Foremost Brands. At the request of *defendant* Braverman, Genesco employed CTE and began paying commissions to the latter. Braverman indicated to Parker that Foremost and CTE were the "same" organization.

4. This is in contrast to the rule with regard to confessions followed in some jurisdictions. Under the so-called "Massachusetts Rule" the trial judge initially determines whether the defendant's confession is voluntary. If the court admits the confession, the jury is instructed that they may ignore it if they disagree with the court and believe the confession to have been coerced. See Jackson v. Denno, 378 U.S. 368, 378 n. 9, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

It is difficult to see what value the declarations could have as proof of the conspiracy, if before using them the jury had to be satisfied that the declarant and the accused were engaged in the conspiracy charged; for upon that hypothesis the declarations would merely serve to confirm what the jury had already decided. United States v. Dennis, 183 F.2d 201, 230–231 (2d Cir. 1950) (L. Hand, J.), aff'd on other grounds, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951).

In sum, the determination by an appellate court that the documents could appropriately have been found admissible by the trial judge, as statements of co-conspirators, does not in any way impinge upon any jury function. No instructions of the trial judge were necessary either to caution the jury as to any limited purpose for which the documents were received or that they might review his assessment that a proper foundation was laid. It is difficult therefore to see any impropriety in now accepting alternate bases for admission of the questioned documents, any objections sought to be levelled on the alternative grounds can and have been made here.[5]

There is authority for our position. Orser v. United States, 362 F.2d 580 (5th Cir. 1966), is directly in point. The trial court, over objection that statements made in the presence of the defendant were hearsay, admitted them on the theory that it was an accusation made against the defendant and since he had not denied them, they were admissible as implied admissions. On appeal, the court found them not to be admissible on this basis, but nevertheless admissible as declarations by co-partners in crime. Even though the trial court had made no finding that a conspiracy existed, the appellate court found that there was ample evidence of the conspiracy upon which the trial court could have predicated such finding, hence no prejudice could be found. 362 F.2d at 585–586.[6]

c) *Admissions*

■ We further find that many of the documents which were admitted were admissible in any event as admissions. For example, many are letters containing directions to Batliner and Buehler to execute contracts, and establish that Rosenstein and Braverman were the operating executives of CTE.[7]

5. Standard Oil Co. v. Moore, 251 F.2d 188, 217–218 (9th Cir. 1957), cert. denied, 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958), relied upon by appellants is distinguishable. In that case the documents held inadmissible under the Business Records Rule, were urged on appeal, as in this case, to be admissible as either admissions or declarations of co-conspirators. The appellate court had to remand for a new trial since for the most part the "admissions" consisted of inter-office memos of employees and agents of the corporation to their principals and not to third parties. They were intramural statements and there had to be some showing that they represented the position of the corporation. No such problem exists here. For the most part the letters here were signed by Braverman and Rosenstein who were of course, in fact, the alter egos of the corporation. Therefore no independent or collateral finding of authority was here required.

6. The charge of Judge Croake here was entirely proper with respect to the ad-

missibility of one conspirator's statements or declarations made in furtherance of the conspiracy against other persons found to be members. Therefore no further instruction was necessary with respect to the theory of admissibility of the Liechtenstein documents. See United States v. Baker, 419 F.2d 83, 88–89 (2d Cir. 1969), cert. denied, 397 U.S. 971, 976, 90 S.Ct. 1086, 25 L.Ed.2d 265 (1970).

See also United States v. Ross, 321 F.2d 61, 68–69 (2d Cir.), cert. denied, 375 U.S. 894, 84 S.Ct. 170, 11 L.Ed.2d 123 (1963), where Chief Judge Friendly oberved: "[W]e should hardly be warranted in reversing for the admission of evidence simply because the judge did not place his ruling on the ground that would most readily have supported it."

7. For example, a letter dated June 20, 1963 from defendant Braverman to Dr. Batliner reads as follows:

I am herewith returning both contracts from Dan River International.

Most incriminating is Exhibit 1025, a letter signed by both Rosenstein and Braverman addressed to Batliner in which they describe themselves as "equal partners and holders of the founder rights" of CTE.

■ After an examination of these exhibits we are convinced that the vast majority of the documents admitted were admissible either as admissions or statements in furtherance of the conspiracy. Those which were not do not in our view constitute prejudicial error in light of the overwhelming proof of the Government.[8] There is no real problem of authenticity here since the letters and documents which were admissible were signed by either Rosenstein or Braverman or both. That the signatures were those of the defendants was virtually conceded at trial. The argument now made that making an issue of their validity on trial would have increased the importance of these documents in the minds of the jury, is not at all persuasive. In view of the admittedly inculpatory character of the documents, it is inconceivable that tactical considerations would have prevented defendants from controverting their authenticity. It is further relevant that the Government had handwriting experts available to establish that the signatures were genuine in the event that their validity was questioned.

## II. OTHER ARGUMENTS

### a) Attorney Client Privilege

■ The appellants have raised several other arguments on appeal which are of less substance. The claim is made that the use of the CTE documents and the testimony of Dr. Monauni constituted a violation of the attorney-client relationship. Although Batliner and Buehler were attorneys, the posture of the defendants has been decidedly ambivalent as to their true roles. The theory of their defense initially at least, was that Batliner and later Buehler were businessmen operating a bona fide successor firm to Foremost and McInerney, engaged in the business of representation of American firms selling goods to European PX's. The letters for the most part reveal that they were in fact puppets who were being directed by Braverman and Rosenstein to sign contracts, forward checks to Bank Leu, order business cards and to arrange for letters of credit. Batliner's letters are routine responses and requests for authority to pay Liechtenstein taxes. "Where an attorney and his client are engaged in business dealings as was the case here the attorney-client rule does not apply." Lowy v. Commissioner, 262 F.2d 809, 812 (2d Cir. 1959).

Appellant Braverman argues that Ex. 1025 is privileged. This is the letter signed by both individual defendants in which they describe themselves as equal partners in CTE and advise Batliner of Buehler's appointment to the administrative board of CTE as well as naming another *anstalt* as the representative of CTE. Batliner is directed in the letter to make the necessary "decisions" concerning the change of residence and in the board and to have these "decisions" registered with the Trade Registry in

---

Please sign both copies for Continental Trade and return same to my attention.

. . . . .

Comparable instructions appear in letters from Braverman, dated March 14, 1963, April 4, 1963, September 3, 1963 and May 28, 1964,

8. Appellants vigorously attack the admission of Government's Exhibit 1029 which was a list of expenses of CTE including the names of Braverman and Rosenstein. The expenses totalled $54 and the Government argued to the jury that such minimal expenses for CTE which purportedly was engaged in substantial business, was indicative of its mere "mail drop" function. Since the memo was unsigned, it was not admissible on the alternate grounds we have accepted. However, that this was the true function of CTE is so clearly established by the other evidence, witnesses' testimony as well as the admissible documents, that we do not consider its admission here prejudicial. It was merely cumulative to that properly admitted evidence.

Vaduz. Despite the use of the word "decisions" it seems evident that Batliner was in fact confronted with a decision previously made by the defendants and simply ordered to perform the ministerial task of amending corporate records.

Even if we make the assumption that the letter represents what would be a privileged communication and not a routine business arrangement, the privilege does not protect communications during the commission and in furtherance of the felony. United States v. Bob, 106 F.2d 37, 40 (2d Cir.), cert. denied, 308 U.S. 589, 60 S.Ct. 115, 84 L.Ed. 493 (1939). The suggestion that since there was no crime committed in Liechtenstein, the attorney-client privilege remained intact, is not at all persuasive. The privilege is that of the client who in this case are American citizens whose scheme to evade United States income taxes is unquestionably criminal. The situs of their attorneys or of the documents produced here is irrelevant. The evidence of the criminal conspiracy here dehors this document is in any event substantial, as we have previously indicated.

b) *Constitutional Right of Privacy*

Appellants argue that the Liechtenstein documents were improperly seized in violation of their Fourth and Fifth Amendment rights. We find that there was no "seizure" of corporate records here by governmental agents. Monauni appeared with the records Batliner had turned over to him and Government Agent Brozen, who accompanied him to the United States, testified that he was unaware of the fact that Monauni had even brought the file until he arrived. There is no showing here of "official misconduct" which would trigger Fourth Amendment rights and attendant exclusionary rules. Coolidge v. New Hampshire, 403 U.S. 443, 487–488, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The request for an evidentiary hearing on this question was properly denied. Agent Brozen was thoroughly examined on this point in the trial. The defense

motion to depose Batliner before trial under Fed.R.Crim.P. 15 was properly denied by Judge Tenney (United States v. Rosenstein, 303 F.Supp. 210, 212 (S.D. N.Y.1969)) since the only allegation made to support the motion was that counsel had "reason to believe" that Batliner would not attend any trial in the United States. This was deemed insufficient to establish factually that the witness could not be present. This determination was properly within the discretion of the judge. United States v. Birrell, 276 F.Supp. 798, 822 (S.D.N.Y. 1967). During the course of the trial when counsel for the defendant during his cross-examination of Monauni, indicated his interest in examining Batliner, the Government indicated that Batliner had stated that he would not testify at that time. However, the Government twice offered, in the presence and out of the presence of the jury, to accompany defense counsel to Liechtenstein to take his deposition. The offer was not accepted. The argument that appellants were deprived of their right to confront Batliner is not supported by the record.

It is not disputed that a corporation has no Fifth Amendment privilege (Wilson v. United States, 221 U.S. 361, 384–385, 31 S.Ct. 538, 55 L.Ed. 771 (1911)); and in any event neither Rosenstein nor Braverman, even though they were the alter egos and sole owners of CTE, can assert Fifth Amendment privileges when corporate records are used against them. United States v. Fago, 319 F.2d 791 (2d Cir. 1963). Even viewed as personal papers rather than as corporate records, we find no Constitutional violation. The papers were in the possession of Batliner who surrendered them through Monauni without Government compulsion. The documents were not privileged and we find no *legitimate* expectation of privacy or confidentiality under the Fourth or Fifth Amendments. Couch v. United States, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973).

c) *Pre-Trial Delay*

The claim of Braverman and Foremost that there was such inor-

dinate delay in the prosecution of this case so as to deny them due process of law is not tenable. Pre-indictment delay is premised on the fact that the conspiracy commenced in 1960 and terminated in 1967 with substantive violations committed from December 1962 through April 15, 1965. The indictment was returned on December 4, 1968. We find no merit in the argument that this delay was unreasonable. There is no suggestion of Government design to create delay and no showing of prejudice. In fact the investigation required here to produce the witnesses and documents in the United States and Europe, placed a tremendous burden on the Government which was dealing with a massive, albeit crude, scheme to defraud. The post-indictment delay from December 4, 1968 to October 26, 1971 was not excessive in our view within the criteria established in Barker v. Wingo, 407 U.S. 514, 92 S. Ct. 2182, 33 L.Ed.2d 101 (1972). There was no demand by the defendants for a trial and no specific instances of prejudice resulting from delay. Again the complicated character of the case is an element to be considered (407 U.S. at 531, 92 S.Ct. 2182). It is also noteworthy that although the Government had placed the case on the calendar in May, 1970, to secure a trial date, defense counsel requested adjournments until the Spring of 1971 because of his own trial schedule. At that time substituted counsel requested a delay until the Fall of 1971.

 Finally, Judge Croake properly denied defendants' motions for discovery under Rules 16(a) and 16(b), Fed.R. Crim.P., as overbroad. United States v. Jordan, 399 F.2d 610, 615 (2d Cir), cert. den., 393 U.S. 1005, 89 S.Ct. 496, 21 L. Ed.2d 469 (1968). Again we find no showing of prejudice in the denial of the discovery orders here where the Government voluntarily made available prior to trial most of its documentary evidence, i. e., the checks made payable to CTE by the manufacturers in payment of the sales commissions.

After reviewing all of the appellants' arguments on appeal, we affirm.