**UNITED STATES of America, Appellee,**

v.

**Samuel KAPLAN, Appellant.**

**No. 1232, Docket 74–1580.**

United States Court of Appeals, Second Circuit.

Argued Aug. 13, 1974.

Decided Oct. 15, 1974.

Rehearing Denied Feb. 19, 1974.

Kenneth J. Kaplan, Asst. U. S. Atty., E. D. N. Y. (David G. Trager, U. S. Atty., E. D. N. Y., Paul B. Bergman, Brooklyn, N. Y., of counsel), for appellee.

Gerald L. Shargel, New York City (La Rossa, Shargel & Fischetti, New York City, of counsel), for appellant.

Before OAKES, Circuit Judge, and FRANKEL and KELLEHER, District Judges.*

FRANKEL, District Judge:

Appellant assails a judgment sentencing him to prison for eight years for unlawful possession and distribution of 25.6 grams of heroin on January 6, 1972. Though the trial was brief and the Government's case depended almost entirely upon the testimony of a single narcotics agent, the sufficiency of the evidence is not questioned. The case was carefully and thoughtfully tried. Nevertheless, we find error in an evidentiary ruling sufficiently serious in the setting of the small record to require reversal.

I.

Drug Enforcement Agent Nicholas Alleva was in charge of the case and gave the evidence upon which the jury convicted. (One other agent, who told of surveillance, completed the roster of government witnesses.) Alleva reported,

* Of the Southern District of New York and the Central District of California, respectively, sitting by designation.

and the jury was permitted to find, that he came to know one Frank Lange, a young man of 24 or so, in November 1971. During that and the following month he and Lange discussed narcotics on four occasions. Late in November he purchased an ounce of heroin from Lange. Lange died, evidently before the instant indictment, never having been brought to trial either for the 1971 transaction or for the one involved in the present case.

So far as the competent evidence reveals, the defendant here, Samuel Kaplan, came into Alleva's view only on January 6, 1972, the date of the transaction charged in the indictment. On that date, having arranged for this in a telephone conversation the day before, Alleva went to the home of Lange's parents, where Lange lived. Arriving at about 2:00 p. m., he was taken by Lange to the latter's bedroom. Appellant was there, half sitting, half lying on a mattress on the floor. There were no introductions. Lange went to a night table and produced a plastic bag that was later shown to contain 25.6 grams of heroin.

While the package was still in Lange's hands, Alleva's testimony continued, the agent said, looking at both of the others in the room: "Either one of you or both of you are going to have to come down with me to get the money." Appellant asked: "Why do we have to go down and get the money?" "Because," Alleva responded, "you guys beat me once, you're not going to do it again." Appellant then motioned to Lange and said: "All right, go down and get the money." Before leaving with Lange, Alleva asked Kaplan about the quality of the package. Kaplan said: "It's five hit stuff. I hit the same stuff five times myself." (Al-

leva explained to the jury the meaning of this: that the heroin in the package could be diluted with five times its weight in cheaper, non-narcotic substances for resale purposes.) Then Alleva and Lange left, to be arrested shortly thereafter in the street. Some minutes later appellant was also arrested after he had left the Lange residence.

We must retrace our steps now to describe the disputed evidence and its further setting. From his opening to the jury, having described this as a case made by "[b]asically . . . one witness," the Assistant United States Attorney contended that Lange had been Kaplan's "lackey," that Kaplan had been "acting as a supplier for Mr. Lange," and that the latter worked throughout "at the direction, at the behest" of Kaplan. With this as his thesis, the Assistant informed the trial judge at the outset that an item of evidence "crucial for the government's case" would be Alleva's testimony that in the telephone conversation of January 5, arranging the next day's meeting, Lange had said "his connection would be there with him." The question whether and how this potent hearsay could be received was debated at great length. Expressing grave doubts, Judge Weinstein finally concluded that the testimony should be allowed, but only for the purpose of explaining Alleva's "state of mind" in what might otherwise have seemed an oddly unreal meeting, without introductions or questions, on January 6 in Lange's bedroom. Having reached this determination and allowed the evidence, the judge instructed the jury with meticulous care as to its limited purpose. We reproduce both the testimony and the instructions in a footnote.[1]

1. "Q. Now, Agent Alleva, did you have a conversation with Frank Lange on the day previous, January 5, 1972?
  "A. Yes, sir I did.
  "Q. And where did this conversation take place?
  "A. It took place over the telephone.
  "Q. Did you call him or did he call you?
  "A. I called him.

"Q. And can you tell us what you said to him and what did he say to you?

"Mr. La Rossa: Objection.

"The Court: I am going to sustain that objection to a limited extent.

"Now, ladies and gentlemen of the jury, as I understand the witness is going to tell you something that Mr. Lange told him over the phone that preceding day.

In allowing Agent Alleva to report Lange's reference to his "connection" the trial judge carefully limited the ground of the ruling to the "state-of-mind" exception. He observed that the record might have justified reception of this hearsay under the exception for a co-conspirator's declarations made during, and in furtherance of, the conspiracy.[2] But he proceeded then "to

"Mr. Lange is not available to be cross-examined so that this defendant does not have his constitutional right to confront this person and to cross-examine him before you so you could watch him.

"I am allowing this testimony therefore to come in only so that, assuming you find it to be true, and that is entirely up to you, you will better understand what was in this witness' mind when he went to the home of Mr. Lange; is that clear, and what, if you believe him to be telling the truth, he expected to find there so that you can evaluate the activities of this defendant—of this witness and the others in the room. But you are not to assume and you may not use this evidence to find that there had been any prior conversations between Mr. Lange and the defendant. Is that clear? There is no evidence at all of that from anything that this witness now describes to you.

"We don't know what was in Mr. Lange's mind and he is not here to tell us. It is only being introduced so that you will understand what was in this witness' mind when he went into that room.

"Any other further limitation?

"Mr. La Rossa: Nothing further, your Honor.

"The Court: Thank you.

*"By Mr. Kaplan:*

"Q. You had a conversation with him over the phone; is that correct?

"A. Yes, sir, that is correct.

"Q. Tell us what you said to him.

"A. I asked him about the quality of the next purchase.

"And he said the quality would be very good.

"I asked him when and where, how we could, you know, perform the next purchase.

"He told me that I should be at his residence at 2:00 p. m. the following day, which would be January 6, at 2:00 p. m., and his connection would be there with him.

"Q. Where was that?

"A. I am sorry?

"Q. Where was that he and his connection was supposed to be?

"A. At this residence which was 1939

"Q. Now, did you have any conversation Homecrest Avenue in Brooklyn. with him about the previous quality of the substance in question?

"A. At that particular day?

"Well, when I asked him about the quality of the subsequent purchase I told him that it had better be better than the original purchase.

"Q. What was your experience with the original purchase?

"Mr. La Rossa: Objection.

"The Court: Sustained to a limited degree.

"Again, ladies and gentlemen, there is no evidence whatsoever that this defendant had anything to do with any prior transaction that this witness may have had with Mr. Lange.

"I am allowing this evidence in only so that you can understand better what was in the witness' mind and perhaps in Mr. Lange's mind so you can better understand what was happening the next day if you credit his testimony.

"But there is no evidence whatsoever that this defendant had anything to do with any prior transaction or with Mr. Lange prior to the day in which he was actually in the room with Mr. Lange.

"Do you wish any further instructions?

"Mr. La Rossa: No, sir."

2. "The Court: I'm not allowing it in as hearsay. I reject the Government's conspiracy theory, with all due respect—

"Mr. La Rossa: Well, with all due respect—I am sorry. Had you completed your statement?

"The Court:—but Judge Feinberg in the Puco case [United States v. Puco, 476 F. 2d 1099 (2d Cir.), cert. denied, 414 U.S. 844, 94 S.Ct. 106, 38 L.Ed.2d 82 (1973)]—I do not believe that we should allow the exception to be pushed as far as it was pushed in that case, assuming there was no independent evidence.

"I think you can still justify it on the ground that subsequent activities can be used to infer a prior agreement. In this case I would be warranted, based on my following the testimony of the agent, and based upon how he described Mr. Kaplan's reaction, in believing independent of the hearsay that there was a prior existing conspiracy and that it is hardly [highly] likely that it existed at least one day in advance of the event.

"So I think in this case I would be entitled to allow it in as a hearsay exception under the conspiracy rule or under the Hillman [sic] Doctrine. [Mutual Life In-

protect the defendant" by limiting instructions based upon express elimination of the co-conspirator exception as a justification for receiving the testimony.

Our disposition of the appeal requires only passing reference to the remainder of the evidence. Defendant, testifying for himself, explained his personal relationships with Lange and his family; admitted he had seen the contraband package delivered to Alleva and suspected the transaction was wrongful but denied flatly any participation in that transaction or other narcotics dealings. A married sister of the deceased Frank Lange corroborated defendant's story in a number of respects.

## II.

█ The evidence against appellant, though enough for a valid conviction, was by no means overwhelming. Whether it was "crucial" or not, the disputed hearsay was properly appraised by the prosecutor as a potent addition to this case. We conclude, however, that its potency lay not in the ostensible purpose of its technical use, as illuminating Alleva's "state of mind," but in its overwhelmingly probable misuse by the triers of fact—as evidence that appellant was in fact Lange's connection, as Alleva said Lange had said. The great danger of such misuse was enhanced because Alleva's state of mind was not, after all, a material issue in the case. In all the circumstances, therefore, appellant is entitled to a new trial at which this hearsay will be excluded.

In arguing that Alleva's state of mind was material, so that the alleged Lange statement was relevant as a kind of "verbal act," the Government stresses that Alleva's conduct in Lange's bedroom would seem "bizarre" without this background fact. There are, however, empirical and logical flaws in this justification. As a matter of sense and ex-

perience, if the jury was disposed to find Alleva generally credible, his behavior need not have seemed bizarre at all. Ordinary folk, not less than federal judges, may come to know that criminal behavior is not always prudent or circumspect. Countless juries have found guilty verdicts for reckless dealings in contraband between newly met traders —"reckless" at least on the part of the seller whose customer turned out to be a government agent. The jury in this case had learned that Lange and Alleva had a history of talking together about, and dealing in, narcotics. If Alleva's competent testimony was otherwise plausible, the jurors could have inferred that Alleva had reason to trust Lange and to know he would not have an innocent chum lolling about while heroin was changing hands. Moreover, Alleva's testimony—that he accused appellant and Lange of having "beaten" him once, and that he addressed primarily the appellant about the money and the quality of the heroin, all coupled with appellant's seeming lack of protest or incomprehension—served the asserted inference the jury was being asked to draw without an inescapable need for the hearsay.

That the hearsay might have helped some more for Alleva's state of mind is not a powerful ground for finding relevance, or, certainly, relevance in more than an attenuated and deeply ambiguous sense. The assertedly meaningful state of Alleva's mind was its state of believing appellant to be Lange's connection. If that was found credible by the jury, it was an almost certain corollary that the jury would have been moved toward sharing Alleva's state of mind about appellant's role. It is not possible as a practical matter to imagine the jury's having isolated Alleva's state of mind as a subject of interest separate from the genuinely ultimate issue as to appellant's activities. Kaplan's role, if any, in Lange's narcotics business was

surance Co. v. Hillmon, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892)]."

"But I think in order to protect the defendant fully I will give a limiting instruc-

tion not permitting them to use it for hearsay purposes."

the heart of the case; in contrast, Alleva's state of mind when he went to the Lange house bore "only a remote or artificial relationship to the legal [and] . . . factual issues raised in the case." United States v. Brown, 490 F.2d 758, 774 (D.C.Cir.1973).

The prosecutor's summation drifted in notable fashion around the shadowy areas of the supposed line between the "hearsay" use of the testimony and the "state-of-mind" use to which it was said to be limited. Speaking of the January 5 telephone call, he said:

"What does Alleva say at that time? He complains about the quality of the heroin. He wants a better quality. Lange represents that it's going to be a good quality. In fact, it is a good quality, as we have heard.

"He also represents that his connection will be there the next day, you've got to remember. When Alleva came into the room, Kaplan was lying on the mattress and Lange was there. There were no introductions at that time. You might ask yourself why there were no introductions. Well, Alleva knew that the connection was to be there, so it was a presumption on his part that the man in the room was the connection. Lange knew that the connection was to be there. He was the one who made that statement, so he doesn't have to introduce Kaplan. Kaplan, of course, knows, if you believe that he was the connection." '

So many states of mind "knowing" and "presuming" the ultimate fact in contention could not fail to suggest that the fact existed.

■ This is a case, in short, where the technically admirable instructions limiting the effect of the evidence may not be accepted as effective. Troubled on this score, the trial judge expressed during the lengthy arguments on the evidence question his disbelief that "the jury [could] . . . make the dis-

tinction as a practical matter." It is sound doctrine, to be sure, that juries must be supposed usually to be able and determined to follow instructions. Bruton v. United States, 391 U.S. 123, 135, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); Lutwak v. United States, 344 U.S. 604, 619, 73 S.Ct. 481, 97 L.Ed. 593 (1953); United States v. Bell, 500 F.2d 1287 (2d Cir., 1974). But there are limits upon the powers of jurors—or judges or anyone—to keep interconnected thoughts separated from each other. Bruton v. United States, *supra*, 391 U.S. at 129–134, 88 S.Ct. 1620; Jackson v. Denno, 378 U.S. 368, 388, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); United States v. Bozza, 365 F.2d 206, 215 (2d Cir. 1966). The effort in this case must be deemed to have exceeded those limits because the "authorized" use of the evidence shaded so closely and uncontrollably into the forbidden. See Shepard v. United States, 290 U.S. 96, 104, 54 S.Ct. 22, 78 L.Ed. 196 (1933).

There remains the Government's alternative argument "that the District Court could have properly admitted Lange's statements not merely to explain Alleva's actions, but as a hearsay statement of a co-conspirator uttered in furtherance of a conspiracy." [3] The prosecution does not conjecture idly in supposing that this exception to the ban against hearsay "could have" been applicable; as we have noted, the trial judge expressed in passing the thought that he "would be warranted" in so ruling. While the judge then proceeded to eschew any such ruling, our study of the record leads to a clear sense that he would have been sustained had he allowed the hearsay to come in under the co-conspirator exception.

■ We are constrained, nevertheless, to hold that the seemingly plausible alternative, because it was explicitly eliminated in the court below, cannot be imported here to justify the disputed evidence. The co-conspirator exception

3. Brief for the Appellee, p. 13, citing, *inter alia*, Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953).

would have been a simpler ground to adopt and administer than the one to which the court carefully limited itself. The problem of instructions we have found unworkable would have been avoided. More importantly for present purposes, however, the availability of this exception depended upon findings that were for the trial judge to make in the first instance, United States v. Geaney, 417 F.2d 1116, 1119 (2d Cir. 1969), cert. denied, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970); Carbo v. United States, 314 F.2d 718, 737 (9th Cir. 1963), cert. denied, 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964); United States v. Dennis, 183 F.2d 201, 230–231 (2d Cir. 1950), aff'd, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951), findings which, had they been made, would have been highly likely to stand on appeal. United States v. Geaney, *supra*, 417 F.2d at 1120–1121; United States v. D'Amato, 493 F.2d 359, 363–364 (2d Cir. 1974); United States v. Calabro, 449 F.2d 885, 889–891 (2d Cir. 1971), cert. denied, 404 U.S. 1047, 92 S.Ct. 728, 30 L.Ed.2d 735 (1972); United States v. Ragland, 375 F.2d 471, 477 (2d Cir. 1967), cert. denied, 390 U.S. 925, 88 S.Ct. 860, 19 L.Ed.2d 987 (1968); United States v. Von Clemm, 136 F.2d 968, 971 (2d Cir.), cert. denied, 320 U.S. 769, 64 S.Ct. 81, 88 L.Ed. 459 (1943). The decisive point now is that the findings were not made. It is not enough to suppose that the judge "would have" or "might have" made them. The fact is he did not. And it was for him, not for an appellate court, to confront and assess the evidence at the point of decision. In the absence of any such decision, this is in the class of cases where "the grounds upon which the . . . [ruling] is based are those upon which it must be judged. Cf. S. E. C. v. Chenery Corp., 318 U.S. 80, 88, 93–94, 63 S.Ct. 454, 87 L.Ed. 626." Oser v. Wilcox, 338 F.2d 886, 893 (9th Cir. 1964). See also In re Adoption of a Minor, 90 U.S.App.D.C.

107, 194 F:2d 325, 326 (1952); Amador Beltran v. United States, 302 F.2d 48, 52 (1st Cir. 1962); Dubern v. Girard Trust Bank, 454 F.2d 565, 571 (3d Cir. 1972).

We cannot say that the course of events "put the defendant off his guard," Shepard v. United States, 290 U.S. 96, 103, 54 S.Ct. 22, 25, 78 L.Ed. 196 (1933), against the use of the exception for co-conspirators' declarations. We do say, considering all the circumstances, that this doctrine cannot retrospectively justify the damaging evidence allowed on a different ground by the district court.

For this reason, the judgment of conviction is reversed.[4]

## ON PETITION FOR REHEARING.

■■ The Government, seeking reargument, urges that the decision herein conflicts with that in United States v. Rosenstein, 474 F.2d 705 (2d Cir. 1973). In the cited case this court held that the trial judge had erred when he ruled certain documents admissible under the business records exception to the hearsay rule. The conviction was affirmed, nevertheless, on the ground that the documents were admissible under the exception for statements of co-conspirators, though this ground had not been taken, or considered, in the trial court. This was, in its setting, a suitable application of the general rule that a judgment on appeal may, and commonly will, be affirmed for reasons different from those followed in the lower court. There are, however, three substantial grounds for distinguishing *Rosenstein* from the case at hand and for reaching a different result on this appeal.

(1) As was repeatedly stressed in *Rosenstein*, the rules governing co-conspirators' statements and business records are both "recognized exceptions to the hearsay rule." 474 F.2d at 710. Thus, as the case stood here, "there [was] no difference in the *purpose* for which the evi-

---

4. Since the case must presumably be retried, we mention the appellant's other contentions only to note that they have been considered and found unmeritorious.

dence [was] sought to be admitted on the alternative grounds. The purpose of admission under any such exception is to establish the truth of that which is contained in the declaration which otherwise would be hearsay." Id. (italics in original). Distinguishing Shepard v. United States, 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed. 196 (1933), and United States v. DeMasi, 445 F.2d 251 (2d Cir.), cert. denied, 404 U.S. 882, 92 S.Ct. 211, 30 L.Ed.2d 164 (1971), the court again emphasized, again with italics, that the Government's alternative ground of affirmance on appeal was simply another hearsay exception, identically serving to make "the documents . . . admissible for the *same purpose*, to establish the truth of what they say." 474 F.2d at 711.

Here, of course, the purpose of admissibility asserted on appeal is not the same as, but signally different from, the limited purpose which was all the trial judge saw fit to allow. Arguments defense counsel could have made to cope with *hearsay* were never made because they were not apposite. To affirm upon the alternative ground would lack the doctrinal base of *Rosenstein* and effect a potential unfairness absent from that case.

(2) Unlike the trial judge in *Rosenstein,* who never considered the alternative ground urged on appeal, the trial judge here addressed that possibility and chose not to adopt it. Whatever he said as to what he could or might have done, this non-adoption is a significant exercise of a power which is primarily the trial judge's. To "affirm" on the alternative ground would be in effect to overrule the decision on which the trial court acted. The ground not adopted at the trial was intellectually and administratively simpler than the narrower one taken. Able trial jurists like Judge Weinstein do not seek out complexities for nothing. We must go on the premise that the pertinent evidence failed to supply him with assurance sufficient to justify the exception for co-conspirators' declarations. This seems specially evident when we compare the character of this evidence in the present case with that in *Rosenstein.*

(3) In *Rosenstein* the non-hearsay evidence of the conspiracy was extensive and compelling. This court observed that the prosecution had "established without any doubt" the use of a corporate dummy by which the conspirators had "brazenly and fraudulently evaded . . . taxes . . . .," 474 F.2d at 708, referred to the "overwhelming" proof of this central element, id., and noted the heavy weight of testimony by many witnesses to "amply demonstrate the charade." Id. at 709. In that setting, especially where the trial judge had not touched the subject or intimated that he might have done otherwise, there was solid basis for exercising the power to make "the *post hoc* determination on appeal." Id. at 712. This case is sharply different. The evidence, from a single witness, was sufficient to sustain the judgment on appeal, but scarcely "overwhelming." It does not entitle us to assume that the trial judge would—or should—have made the determination he withheld and which we have been asked to make for him on appeal.

The petition for rehearing is denied.