UNITED STATES of America, Appellee,

v.

Gregory JENKINS, Appellant.

No. 76–1802.

United States Court of Appeals, Fourth Circuit.

Reargued Feb. 6, 1978.*

Decided June 12, 1978.

---

\* The case was originally argued November 12, 1976 before a panel composed of Bryan, Craven and Widener, JJ. Because of the death of Judge Craven before a decision was reached, it became necessary to order a reargument of the case before a reconstituted panel.

Robert E. Cahill, Baltimore, Md. (Melnicove, Kaufman & Weiner, Baltimore, Md., on brief), for appellant.

Daniel F. Goldstein, Asst. U. S. Atty., Baltimore, Md. (Jervis S. Finney, U. S. Atty. and Andrew Radding, Asst. U. S. Atty., Baltimore, Md., on brief), for appellee.

Before BRYAN, Senior Circuit Judge, WINTER and WIDENER, Circuit Judges.

ALBERT V. BRYAN, Senior Circuit Judge:

On appeal is the conviction of Gregory Jenkins for making false material declarations on January 7, 1976 to a grand jury of the United States District Court for the District of Maryland at Baltimore. 18 U.S.C. § 1623.[1] The jury was inquiring into any activities of one Jerra Lyles related to the illicit distribution of narcotics, especially with one Beatrice Johnson, alias "Miss B". Error is assigned (1) to the receipt into evidence at trial of conversations between Johnson and Lyles in the absence of Jenkins and (2) to the conclusion of the Court that the allegedly perjurious testimony was material within the meaning of the statute. As we think the assignments are not well taken, we affirm.

Lyles, under investigation for conspiring to manufacture and distribute heroin in breach of 21 U.S.C. §§ 846, 841(a)(1), was overheard by an agent of the United States Drug Enforcement Administration, through an authorized wiretap, conversing with "Miss B" by telephone at 1:14 a. m. on July 26, 1975. The purport of the conversation was that she would meet Lyles within the hour at his home in the 1200 block of North Ellwood Avenue, Baltimore. DEA agents immediately placed a close watch there. Near the appointed hour they saw a van park directly in front of the house. They saw, too, a woman—known to them as "Miss B" and as the appellant Jenkins' cohabiter of two years—leave the van and enter the house. The vehicle was later traced to Jenkins as having been borrowed from his employer that evening.

As a witness before the grand jury on September 24, 1975, Jenkins had been questioned on his movements in the first hours of July 26, 1975, when he was seen with Beatrice Johnson in the neighborhood of the Lyles residence. His testimony had been that he was endeavoring to see a friend living in the 1300 block of North Ellwood Avenue and that Johnson, just along for the ride, did not leave the van.

Discerning a difference between his and the agents' statements, the jury recalled Jenkins on January 7, 1976. At this appearance he repeated his prior statement, averring that Johnson was along "just to ride across town" with him, but admitted that she did leave the van for about ten

---

1. Section 1623 at the time of the offense provided:

"(a) Whoever under oath in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration . . ., shall be fined not more than $10,000 or imprisoned not more than five years, or both."

minutes during his absence, coming back after he had returned. He still insisted that she had not told him that she had any other reason for accompanying him and that he did not know where she had gone.

In his trial on the perjury indictment, Jenkins gave yet a third account of his activity that night. It was that he first stopped in the 1300 block of North Ellwood Avenue to visit a friend and that, as he left, Johnson asked to visit friends in the 1200 block. In compliance, he then drove to the 1200 block, parked near the corner, and let her out of the van to go to her friend's house while he waited. Shortly she returned and they departed.

The indicted statements of Jenkins before the grand jury were (a) that he gave a false reason for his driving Johnson to the 1200 block of North Ellwood Avenue and (b) that he gave a false account of the sequence of events surrounding her visit to the Lyles residence.

## I.

Over Jenkins' objections, transcripts of the intercepted telephone conversations between Johnson and Lyles were admitted in evidence against him at trial. The primary ground of his objections is that the statements by the two of them were inadmissible hearsay as to Jenkins, inasmuch as he was not a party to the conversations and was not present at either end of the line nor mentioned during them.[2] However, irrespective of the accuracy of their characterization by Jenkins as hearsay, we cannot agree with him as to the admissibility of the statements.

The trial judge cautiously and appropriately restricted the scope to be given this testimony, saying:

"In certain situations, evidence may be admitted not [sic] only for a particular, or for a limited purpose, and not for general purposes. You have heard, during the course of this evidence in this case certain tapes of telephone conversations that had been authorized by Court order, and you have seen also and heard the transcripts of those conversations, and they have been admitted into evidence as Government's Exhibits . . .. The conversations were not admitted to establish the truth of the matters contained in those conversations, but only to indicate the purpose of the visit by Miss Johnson to the 1200 block North Ellwood. For that limited purpose, you may give it such weight as you may think it is entitled to."

The sole function of the challenged tapes was to apprise the jury of "Miss B's" state of mind—her *knowledge* that Lyles was waiting to complete a transaction with her and her *intention* to go to meet him. Given this knowledge and intention, the jury might reasonably infer, *from the fact that Johnson and Jenkins appeared at Lyles' residence very shortly thereafter*, that Jenkins drove there because Johnson (the "Miss B") had asked him to do so. If the jury reached this conclusion, it could properly conclude that Jenkins had lied about his reason for making the trip.

Insofar as elements of the taped conversations not *directly* expressing Johnson's intent were offered to prove that intent, they were *not* hearsay, for the import of them was their effect on her and not their truth. *See* Fed.R.Evid. 801(c). Thus, Lyles' statements offering to consummate a transaction that evening were admissible to explain her subsequent actions. *United States v. Demopoulos*, 506 F.2d 1171 (7 Cir. 1974), *cert. denied*, 420 U.S. 991, 95 S.Ct. 1427, 43 L.Ed.2d 673 (1975).

The only statement introduced on the issue of intent which, arguably, was for the truth of the matter therein expressed, and hence hearsay—Johnson's closing remark, "I'm on my way"—nevertheless would be admissible under Rule 803(3) of the Federal Rules of Evidence,[3] both to show her intent

---

**2.** Jenkins also challenges the relevancy of the tapes but, as the discussion in text will show, this claim is without merit.

**3.** Rule 803 provides, as pertinent here:

"The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

\*    \*    \*    \*    \*    \*

and to promote an inference that she actually effectuated her intent and set out for Lyles' house.

Precedent for the use of these communications, to which the accused was a stranger, is found in *Mutual Life Insurance Co. v. Hillmon*, 145 U.S. 285, 295, 12 S.Ct. 909, 36 L.Ed. 706 (1892), which involved claims on insurance policies naming one Hillmon as the insured. The designated beneficiary, his wife, sought recovery on them, asserting that he had died accidentally while travelling through southern Kansas to camp at Crooked Creek.

A body had been found there and the question in suit was whether it was the body of Hillmon or of one Walters. The defendant insurer sought to prove that Walters was in the area where the body was discovered. As placing him there, letters written by Walters just previously were tendered in evidence but excluded by the trial court. On appeal this ruling was reversed, the Court reasoning that the letters were receivable toward establishing that Walters intended to go to Crooked Creek and that this intention was pertinent to show that he actually did go.

Presently, *pari ratione*, the tapes were competent to establish the intention of Johnson to go to the home of Lyles early on July 26 and, hence, the fair deduction that she acted on that intention. The opinion in *Hillmon* put it this way:

> "A man's state of mind or feeling can only be manifested to others by countenance, attitude or gesture, or by sounds or words, spoken or written. The nature of the fact to be proved is the same, and evidence of its proper tokens is equally competent to prove it, whether expressed by aspect or conduct, by voice or pen. . . . [W]henever the intention is of itself a distinct and material fact in a chain of circumstances, it may be proved by contemporaneous oral or written declarations of the party." 145 U.S. at 295, 12 S.Ct. at 912.

Thus, the tapes attacked Jenkins' explanation to the grand jury as to why he set out with Johnson in the early morning hours of July 26 and subsequently stopped near the Lyles residence.

Jenkins' reliance upon the limitation of *Hillmon* engrafted upon Rule 803(3) by the Congress when it approved the Federal Rules of Evidence is misplaced. Approving the Rule in its submitted form, the Congress directed only that it be construed to confine the doctrine in *Hillmon* so that statements of intent by a declarant would be admissible only to prove the *declarant's* future conduct, not the future conduct of others. *See* H.R.Rep.No.650, 93d Cong., 1st Sess. 13–14 (1973), U.S.Code Cong. & Admin.News 1974, p. 7051.

Instantly, Johnson's salutation to Lyles, "I'm on my way", (or even a statement that she would come over *with Jenkins*) would be inadmissible under the Congress's limitation if offered solely to prove that Jenkins did accompany Johnson. However, the purpose of the proffer here was not to show that Jenkins drove to the Lyles residence—substantial independent evidence was introduced on that point—but rather solely to show *why* Jenkins left home in the middle of the night, drove across town, and let Johnson out in the 1200 block of North Ellwood Avenue.

This case is thus unlike *United States v. Kaplan*, 510 F.2d 606 (2 Cir. 1974), cited by appellant. There, the defendant was convicted of unlawful possession and distribution of heroin. The Government's case "depended almost entirely upon the testimony of a single narcotics agent," who testified extensively about his relationship with a third party, Lange, and especially about a meeting between himself, Lange, and defendant Kaplan, at which the agent purchased narcotics from defendant. *Id.* at

---

"(3) Then existing mental, emotional, or physical condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health) . . . ."

607–08. At trial, the agent described a telephone conversation the day before the meeting in which Lange stated that "his connection [Kaplan] would be there with him". *Id.* at 608. The account of the telephone conversation was admitted, over objection, "but only for the purpose of explaining [the agent's] 'state of mind' . . . ." *Id.*

The Second Circuit reversed, concluding that the evidence offered by the agent should have been excluded because of "its overwhelmingly probable misuse by the triers of fact—as evidence that appellant [Kaplan] was in fact Lange's connection . . . ." *Id.* at 610.

■ We are not persuaded by Jenkins' reliance upon *Kaplan*, for we find significant differences between the two cases. Most importantly, the statements in *Kaplan* were accusatorial statements from Lange to the agent, regarding the *activities* of Kaplan. Here, the transcripts of the intercepted telephone conversations were offered only to show *why* Jenkins behaved as he did. The purpose was not to show his conduct on the night in question. Further, as we have intimated, *supra*, p. 842, unlike the *Kaplan* court, which determined the agent's state of mind to be neither material nor relevant, 510 F.2d at 610, we have concluded that "Miss B's" state of mind was material, given the circumstances of this case.

## II.

■ Looking to the materiality of Jenkins' false statement, it is necessary to recall that the inquest of the grand jury was shaped to the activities of Lyles, not only when he was alone, but more to his contacts with other persons, as the charge against him was "distribution" to customers. Appellant's grand jury testimony was material to the identification of "Miss B" as the woman who went to see Lyles and as a potential buyer. This aim would have been advanced if Jenkins had told the jury that he had taken her to the residence of Lyles.

Furthermore, the explanation would have matched the tryst arranged in the telephone conversations, and the jury then would have known that the "Miss B" of the telephone conversations was Beatrice Johnson. Again, the falsity of the explanation was material because it hindered the grand jury's inquiry as to Lyles, since it contradicted the report of the Government agents that they had seen her go into the Lyles residence.

For these reasons, the judgment of the District Court will not be disturbed.

Affirmed.

WIDENER, Circuit Judge, dissenting:

I respectfully dissent on the ground that the taped telephone conversations constitute inadmissible hearsay.

The only question before us in this part of our consideration of this perjury trial is whether Jenkins knowingly drove Johnson to Lyles' home, or whether, as Jenkins testified to the grand jury, he was on a different mission of his own, with Johnson simply going along for the ride.

The tapes were not needed to prove that Johnson actually visited Lyles' residence on the night in question, or even that Jenkins dropped her off in the vicinity. The point was simply not contested; Jenkins admitted the fact, and in addition there was evidence from the surveilling agents who saw her. The only thing the tapes were needed for, from the government's standpoint, was to support an inference that Johnson asked Jenkins to drive her by Lyles' house, and that Jenkins therefore lied to the grand jury when he denied knowledge of where Johnson was going. Given this central purpose, the taped conversations were hearsay.

The government contends in its brief that the tapes were not introduced to prove that Johnson asked Jenkins to drive her to Lyles' house. Indeed, it concedes that they would not be admissible for that purpose,[1] a con-

1. In its brief, the government states, "Jenkins seems to be claiming that Johnson's telephonic

agreement to meet Lyles cannot be used to prove (1) that Johnson told Jenkins she wanted

cession I think the majority incorrectly refuses to accept. Rather, the government claims the tapes were needed only to show that Johnson wanted to go to Lyles' house right away. But this fact is relevant to the perjury charge only to the extent that it supports an inference that Johnson requested Jenkins to drive her to Lyles' house, the very fact the government concedes the tapes would not be admissible to prove.

I think the majority's application of Rule 803(3) of the Federal Rules of Evidence is erroneous. As the court correctly observes, the hearsay exception for statements of a declarant's existing state of mind is applicable only to admit proof of the declarant's future conduct, not that of third persons. "Rule 803(3) was approved in the form submitted by the Court to Congress. However, the Committee intends that the Rule be construed to limit the doctrine of *Mutual Life Insurance Co. v. Hillmon*, 145 U.S. 285, 295–300, [12 S.Ct. 909, 36 L.Ed. 706] (1892), so as to render statements of intent by a declarant admissible only to prove his future conduct, not the future conduct of another person." H.R.Rep.No.93–650, 93d Cong., 2d Sess. (1974), 4 U.S.Code Cong. & Admin.News at 7087. Thus, if Johnson had stated, "Jenkins is about to drive me over," clearly the statement would be inadmissible to prove that Jenkins did so. The majority opinion concedes this much, yet it is willing to accept the introduction of a hearsay statement, the only relevance of which is to prove the same thing as the just-quoted statement, only to do so inferentially, rather than directly. The point is that the tapes were not introduced merely to prove that Beatrice Johnson went to visit Lyles on the night of July 26, 1975. They were introduced to prove by inference something that they would be inadmissible to prove directly, that Johnson asked Jenkins for a ride to Lyles' house, that Jenkins knowingly complied with the request, and therefore that Jenkins lied to the grand jury.

I further believe that the panel inadequately distinguishes *United States v. Kaplan*, 510 F.2d 606 (2d Cir. 1974), although I do not base my dissent on that case alone as I have explained above. In *Kaplan*, a wiretap conversation between a narcotics agent and one Lange was admitted in evidence in which Lange had told the agent on January 4th that at the next day's meeting Lange's "connection would be there with him." The connection was the defendant Kaplan. The statement was admitted for the purpose of explaining the narcotics agent's state of mind at the subsequent meeting, and the trial court so instructed the jury. The Second Circuit reversed, not because the evidence was immaterial as the panel may suggest, p. 844, but because it was "not possible as a practical matter to imagine the jury's having isolated Alleva's state of mind as a subject of interest separate from the genuinely ultimate issue as to appellant's activities," *Kaplan*, p. 610, as previously alluded to in the opinion on p. 843. Our case is even stronger for the defendant, for in *Kaplan* the statement was baldly accusatorial as the majority acknowledges, while here the accusatory nature of the statement is only arrived at by inference.

While I agree with part II of the opinion as to materiality, I think the conviction should be reversed and the case remanded for a new trial because of the improper admission of hearsay. I believe the opinion sets a precedent, dangerous in scope, for the promiscuous admissibility of wiretap evidence.

him to drive her to Lyles' house, and (2) that Jenkins agreed and then drove her there. *The Government agrees. The telephone calls could not be used to prove those facts and were not introduced for that purpose.* As stated in its pre-trial memorandum, and as adhered to in its case and argument, the Government merely wanted to use the telephone calls to show that Johnson wanted to go to Lyles' house right away." (Italics added)