UNITED STATES of America, Plaintiff-Appellee,

v.

Peter CICALE, Frank DeSimone, Paul Spector, Defendants-Appellants.

Nos. 1071, 1078, 1235, Dockets 82–1018, 82–1020, 82–1022.

United States Court of Appeals, Second Circuit.

Argued June 1, 1982.

Decided Oct. 7, 1982.

Gerald L. Shargel, New York City, for appellant Cicale.

Jay Goldberg, New York City, for appellant DeSimone.

Robert J. Carlucci, Mineola, N. Y. (Carlucci & Legum, Mineola, N. Y., of counsel), for appellant Spector.

Lesley Oelsner, Asst. U. S. Atty., S. D. New York, New York City (John S. Martin, Jr., U. S. Atty., S. D. New York, Walter P. Loughlin, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before KAUFMAN and WINTER, Circuit Judges, and WARD,* District Judge.

RALPH K. WINTER, Circuit Judge:

Paul Spector, Frank DeSimone, and Peter Cicale appeal from judgments of conviction entered in the United States District Court for the Southern District of New York, after a 13-day jury trial before Judge William C. Conner. Cicale, Spector and DeSimone were found guilty of conspiracy to distribute heroin and to possess it with the intent to distribute in violation of 21 U.S.C. § 846 (1976). In addition, Cicale was convicted of a separate count of heroin distribution and possession with intent to distribute based on acts taking place on March 23, 1981, in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A) (1976) and 18 U.S.C. § 2 (1976). Appellants assert essentially four grounds of error. First, each contends that hearsay evidence was improperly admitted against them under the co-conspirator exception to the hearsay rule, Fed.R. Evid. 801(d)(2)(E). Second, each claims that the evidence was insufficient to prove his guilt beyond a reasonable doubt. Third, Cicale contends that he was improperly denied the right to counsel of his own choosing by the trial court's refusal to grant a continuance. Fourth, DeSimone asserts that Judge Conner improperly commented upon his failure to testify.

We affirm.

---

* Honorable Robert J. Ward, United States District Judge, for the Southern District of New York, sitting by designation.

## BACKGROUND

Because the factual context is important to our decision, we set it forth in some detail.

On October 29, 1980, DEA Agent Eloy Garcia was introduced to John Messina on a Manhattan street corner. The two discussed Garcia's desire to secure regular supplies of heroin for a "customer" in Chicago. Through a DEA informant, Messina had already given Garcia a sample of heroin in exchange for mannite, a substance used to dilute heroin, and, at this October meeting, Garcia supplied Messina with a second token of good faith, an orange plastic bag containing a pound of quinine, another dilutant. In turn, Messina assured Garcia he could sell him a half kilogram of heroin every 10 days and quoted a series of prices for the drug. After complaining about the quality of the mannite, Messina announced that he wanted his "man," who was "waiting for [him] down the street," to test the quinine. Messina then drove seven blocks to the corner of York Avenue and 79th Street where DeSimone, his brother-in-law, was waiting. DeSimone got into the car, which Messina drove back up York Avenue to 86th Street. DeSimone got out of the car and carried the orange bag into a grocery store. He returned a few minutes later holding a brown paper bag of about the same size. He then travelled downtown to an office building on 47th Street by a combination of bus and foot.

On November 14, 1980, Garcia again met with Messina. This time Messina sold Garcia an eighth of a kilogram of heroin for $30,000.[1] After the sale was completed, Messina indicated his eagerness to continue doing business with Garcia. Messina asked Garcia when he would be ready to purchase more heroin and whether he would be willing to "double"—to buy twice the amount of a half kilogram—the next time. On

---

1. The government stipulated at trial that none of the appellants were the source of this particular package of heroin.

December 11, 1980, the pair met again. They discussed the possibility of further purchases and Messina asked Garcia to supply him with another two pounds of quinine, explaining that he had all the heroin he needed but did not have enough dilutants to prepare the drug for distribution. On December 16, Garcia called Messina and the two met for lunch. Garcia gave Messina the quinine but explained that he was unable to purchase more heroin until he was certain that he would receive regular deliveries. Messina told him not to worry and bragged of having "five different sources of supply." The two then went to Messina's home in the Bronx for dinner where Messina showed Garcia a kilogram of heroin and offered to let him have it on a promise of later payment. Garcia refused, indicating that he was not in the market for isolated purchases.

Garcia and Messina met again for lunch in Manhattan on January 15, 1981. Garcia suggested that he give Messina's most reliable source $75,000 for heroin worth $50,000. The source could either keep the remaining $25,000 if Garcia were unable to order a further delivery of heroin within the week, or apply the money to subsequent drug purchases. Messina said he would "go talk with the guy," a source he was going to meet right away. Within the hour, Messina and Peter Cicale were observed together in Messina's Cadillac. The two spent the entire afternoon together; indeed, Messina met with no one else during the four and one-half hours he spent with Cicale. However, late in the afternoon, Cicale left Messina alone inside Bloomsbury's Restaurant, took Messina's car and drove to a nearby apartment building where he met with an unidentified man. He then returned to the restaurant and spoke briefly with Messina.

The next day, January 16, 1981, Garcia met Messina to carry out the deal. Garcia had $75,000 with him and Messina, for his part, was carrying a quarter kilogram of heroin. However, Garcia refused to continue when he saw that Messina's source had not accompanied him; Messina attempted to make excuses but Garcia remained firm, insisting he was interested only in a permanent relationship and not in spot purchases.

In early March, Garcia and Messina began to see each other frequently, embarking on an odyssey which took them regularly to a racquetball court in Fort Lee, New Jersey, and numerous restaurants, coffee shops, and bars throughout the New York area. On March 3, after a game of racquetball, Garcia pressed Messina for a commitment to supply the "Chicago customer" with a half kilogram of heroin each week. Messina promised to talk to "a couple of sources the next day" to determine if he could arrange to do that type of continuous business. On March 4, the next day, Messina met with Anthony Todisco, a convicted narcotics dealer. Also on that day, a wiretap of Messina's home telephone revealed that he spoke to Cicale and arranged a meeting for the next day, which snow prevented. According to another intercepted conversation, Messina also had planned to meet appellant Paul Spector on the fourth but for unexplained reasons that meeting fell through as well.

On March 6, Garcia and Messina played racquetball again. Garcia tried to hurry things along by stating that his Chicago customer would be stopping in New York to meet him on his way home from Miami. Messina said he had not yet spoken to his source but that he had plans for a meeting that night. He also gave Garcia detailed instructions concerning the use of the telephone, explaining that he was anxious about wiretaps. That night Messina met with John Beneducci and Vito Demicolo, two more known narcotics dealers.

On March 7, Garcia and Messina met at a barbershop and then went to lunch. Messina reported difficulties securing the kind of commitment Garcia was demanding but promised to speak to another source that same evening. In the late afternoon, he called Paul Spector and arranged to see him on the eighth. Messina then went to a family birthday party at LeChantilly Restaurant in Manhattan at which DeSimone was present.

The next day, Garcia called Messina to report that he would be meeting with his

Chicago contact that afternoon. Shortly afterward, Messina received a cryptic call from Spector postponing their meeting in order to pick up "this thing"—"thing" being underworld jargon for heroin.

On March 9, Spector called Messina in the morning and they met at a Yonkers restaurant. An undercover agent at the next table overheard Spector complaining, "I don't want to do it that way. I would rather not do it that way. I don't want to. I would rather not." Messina replied, "Whatever you want to do." A few hours later Messina met Garcia in a Fort Lee diner and Messina reported that he had "spoken to a guy that morning, but the guy was wavering," and "wasn't sold on the idea of having to meet anyone else." Garcia then stated that he recognized he would have to do business with Messina on an *ad hoc* basis and asked Messina to get him a price list. Messina agreed. That night, Messina visited DeSimone and also telephoned Spector to arrange a meeting for the morning of the tenth.

On March 10, Spector and Messina played racquetball in the morning and Messina then met Garcia at a Manhattan restaurant. Messina said he had played racquetball with one of his sources that morning but the source was unwilling to meet Garcia. Messina reported, however, that he had been able to get a price list which he furnished to Garcia. Messina then remarked that he had another source he could contact. At 10:00 p. m., Messina called Cicale and arranged to meet him the next day.

On March 11, Messina and Garcia again met to play racquetball and have lunch. This time they set up firm arrangements for a sale. Messina was to supply Garcia with three and a half kilograms of heroin at a price of $770,000. On Friday, March 13, Spector visited Messina at his apartment and, while he was there, Garcia called to arrange an immediate meeting with Messina at the Plaza Diner in Fort Lee. Messina set the meeting with Garcia for 7:00 p. m. and then called Cicale to warn him that he would call again that evening between 6:30 and 7:00 p. m. At 6:30 p. m., Messina left

home, drove to Cicale's apartment building, which was near the diner, and went into the lobby. After departing, he drove to the Plaza Diner where Garcia was waiting. Garcia requested an eighth of a kilogram of heroin for his Chicago customer who was coming into town. Messina said his personal supply was inaccessible until Monday but he could try one of his sources who lived nearby, and, if unsuccessful, he would call Garcia with a coded message to meet him on Monday. Messina then left for an apparently fruitless drive around the northern New Jersey suburbs, first to DeSimone's house in Palisades Park, then to the home of another narcotics dealer in Englewood Cliffs, and finally to Cicale's apartment in Fort Lee. He called Garcia to say he would see him on Monday.

Over the weekend, Messina met or spoke with each of the appellants. On Saturday, Messina spoke to Cicale three times. After the first call, Messina drove to Fort Lee, picked up Cicale and they then drove into New York City together. Later that afternoon, Cicale called Messina and urged, "Don't mis-shoot whatever you do ..." Then, around dinnertime, Spector called Messina and stated, "that thing is not, is a little bit of a problem." Messina cut him off saying, "Why don't you just see me. All right?" and the two agreed to meet the next day. Immediately afterward, Messina telephoned DeSimone and arranged a tentative meeting for the next day. A short while later, Messina telephoned Cicale. Cicale agreed to come to Messina's home and, a half-hour later, he arrived for a ten minute visit.

On Sunday, Messina called Spector at 1:00 p. m. and the two set up an evening meeting. Messina then visited DeSimone and Cicale, leaving Cicale's apartment building at 8:00 p. m. to drive to the nearby home of another known drug dealer. Messina spent half an hour there and then returned to Cicale's house. The two then drove to the Tre Amici Restaurant in Manhattan. Cicale left Messina inside the restaurant while he drove to 137 East 36 Street—the address Cicale had visited on

January 15 prior to the aborted January 16 sale of heroin to Garcia. Messina, meanwhile, was observed sitting with Spector in the restaurant. Cicale returned, inquired as to the whereabouts of a "Jimmy," and was directed to Messina's table. He joined Messina and Spector for ten minutes. The meeting broke up with Messina telling Spector to telephone him the next morning.

On Monday morning, March 16, Messina met with DeSimone. Early in the afternoon, Messina drove to Cicale's apartment building to look for him, and failing that, went to look for DeSimone. He then returned to Cicale's building and met Cicale in the lobby. The two held a brief conversation. Several hours later, Cicale telephoned Messina who told him, "Took a ride. Made a stop out there . . . And now I'm back to let you know that I could really shake 'em down." Cicale, in turn, remarked, "You remember Saturday night? . . . Remember I talked to you about . . . Is that still there?" At about 9 p. m. Messina went to a public phone and placed a call. After returning to his home, he then spoke to Spector and arranged to meet the next morning. A little later, Cicale called to inquire whether Messina's "friend ever came over." When Messina replied negatively, Cicale asked to be informed if the friend should stop by.

On Tuesday morning, March 17, Spector and Messina met in Yonkers as arranged. Afterwards, Spector drove toward White Plains trailed by an entourage of DEA surveillance officers. Spector visited several banks; the next day he told Messina he had been followed by police officers in a blue car.

Meanwhile, Messina met Garcia at the Fort Lee racquetball courts. This time, Garcia asked for a half kilogram of heroin for his Chicago customer who was coming into town that same evening. Messina indicated that there would be no problem.

Shortly thereafter, Messina called Cicale, remarking that he had looked for him at home but had not seen his car. The pair agreed to a dinner meeting. Meanwhile, at 5 p. m., Messina met Garcia, explained there

was a hitch delaying the deal, and announced that he would have "to check it out." Messina returned home, spoke with DeSimone to set up a tentative meeting and then drove back to Manhattan to meet Cicale as agreed at the Tre Amici. After spending an hour and a half or so in the restaurant, they left and drove in a ten block square without making any stops save for traffic lights and then returned to the Tre Amici. During the drive, surveillance agents observed Messina peering into a brown paper bag. After briefly going inside the restaurant, Messina and Cicale split up. Messina drove home and, at 10:30 p. m., called Spector and arranged a meeting for the next day. At midnight, Messina called Garcia to tell him that "everything seemed all right" but that they should meet anyway to discuss the matter.

The next day, March 18, Messina, along with his wife, met Spector at their usual Yonkers diner. After the meeting, Messina drove his wife home and continued on to Fort Lee where he met Cicale at the latter's apartment building. Cicale and Messina left a few hours later, got into Cicale's car and drove around in an evasive manner. Shortly after 3:00 p. m., Messina met Garcia at the Plaza Diner, their usual rendezvous, and Messina reported that his "people" had been followed by a blue police car the day before and had been unable to go to the "stash pad" to pick up the half kilogram of heroin; however, Messina assured the agent that he himself had taken appropriate evasive action before their present meeting. They then discussed Garcia's proposed purchase of three and one half kilograms of heroin and started planning for delivery and payment. Soon after the meeting, Messina met with Cicale in Cicale's car and the two drove back to Cicale's apartment. Messina went inside and came back outside with DeSimone, got into DeSimone's car, and spoke for a while. In the evening, Messina talked with Spector and again with Cicale.

The next day, March 19, Messina told Garcia that he was still having trouble securing the heroin; he maintained that the

trouble arose because, "my people have been followed, they have heat," and, therefore, weren't going near the stash pad. Messina said that he would try an alternate source for the heroin and suggested that Garcia get the money while he met with his source. Messina drove Garcia to a different Fort Lee restaurant, Tom Swift's, which he designated as their new meeting place. As they parted, Messina said to Garcia, "I'm going to talk to the guy right now, I'm going to his house, he lives down the street here." Messina then drove directly to Peter Cicale's apartment building without making any intervening stops and arrived about five minutes after he left Garcia. Messina then telephoned his wife and said he was "over at Petie's."

Cicale, however, was not at home. Messina quickly returned to Tom Swift's and explained to Garcia that he had gone to his source's house, but the source was not at home. Messina said he had made several telephone calls and had finally located the source in New York City. Messina and Garcia then drove into Manhattan and Messina deposited the agent at Bechets, an eastside restaurant, and told him to wait. Messina then drove to three restaurants he had visited previously with Cicale—Tre Amici, El Parador, and Bloomsbury's—and, failing to find him, called home and told his wife, "I'm out looking for Peter like crazy. I can't find him anywhere." Messina rejoined Garcia at Bechet's shortly before midnight and explained that he had found his source but that the man was reluctant to do business because he was entertaining out of town relatives. Cicale's brother-in-law was visiting the New York area at the time.

On March 20, Messina visited Cicale's building and played racquetball with Garcia afterwards. Messina told Garcia he was expecting a call from his source that afternoon and invited Garcia to wait for the call with him. While Garcia and Messina were having their conversation at the racquetball courts, DeSimone called Messina's house and spoke to Mrs. Messina, remarking that he was "working on a few deals." Mrs. Messina, obviously wary of telephone sur-

veillance, cut him off with a half-joking comment that she was "going to go into business" herself, doing sculptured fingernails.

After waiting some time at the Messina home, Messina, Garcia and Messina's daughter left the Bronx and drove to Manhattan. While Garcia took Messina's daughter to a hair-stylist, Messina went to a westside barbershop patronized by Cicale and also frequently telephoned by him. Messina waited there for about 20 minutes and then returned to the hair-stylist where Garcia had remained. Messina explained that the deal had been delayed and proposed that they go back to his home and wait for the call there.

After they reached Messina's home, Messina walked to a nearby candy store to call the source from a pay phone booth. At 7:00 p.m., when no call had yet come through from his source, Messina left the house to look for a "backup." At the same time, DeSimone drove into the area and cruised around as if looking for someone. DeSimone went to a pay phone three blocks from Messina's house and called Messina's home. As DeSimone spoke to Mrs. Messina, Messina interrupted by walking up to the phone booth and the two held a brief conversation. Messina then went home and told Garcia that one source was out but that a second had agreed to meet Messina the next day. However, while Garcia and Messina ate at a nearby restaurant, Messina received a call. He then told Garcia there would be yet another delay.

On the following day, Messina stopped briefly at DeSimone's house and that of another contact before meeting Spector in Yonkers. Returning home, Messina called Cicale and then went to his apartment building. The next morning, Messina went back to New Jersey and called Garcia telling him, in effect, to stand by. He then met for about 40 minutes with the contact from the previous day. That night, Messina called Cicale who told him, "I'm in a serious mood ... I want to get this straight." A few minutes later Messina called Garcia and told him to meet him the

next day, March 23. Messina then drove to 116th Street and First Avenue in Harlem and made a telephone call. After that, Messina met Cicale at 400 East 117th Street, the home of Cicale's mother-in-law, and the two men drove off together in Cicale's car. At mid-day, March 23, Messina visited Cicale's apartment building for 15 minutes and then met with Garcia. Messina told Garcia the deal was on and Garcia allowed that he would now complete his own arrangements for the purchase. Messina replied with words to the effect that he was going to see his source "right now to make sure everything is squared away." Messina went directly to Cicale's apartment building and spent 15 minutes inside. At 9:00 p. m., he went to the same Harlem neighborhood he had visited the night before. He called Garcia and at 10:20 p. m. the two met in a prearranged Fort Lee restaurant. They then went to Bechet's in Manhattan. In the restaurant bathroom, Messina handed over about one-eighth kilogram of 100 percent pure heroin in exchange for $30,000 in cash.

On March 25, Messina and Garcia played racquetball and ate lunch together. Messina said that the same "guy" who had supplied the heroin on March 23 would also supply the three and one-half kilograms of heroin Garcia wanted, and that he, Messina, would speak with his supplier right after lunch. Messina then went directly to see Cicale.

Over the next few days Messina continued to meet with the ever-patient Garcia to report his continuing, but apparently unsuccessful, efforts to arrange the three and one-half kilogram sale. Between March 27 and April 2, the two met at least three times and visited at least six different restaurants as well as the racquetball courts in their pursuit of the three and one-half kilos. On April 2, however, Messina was finally able to report that it looked "pretty good" and, the next day, he came forward with a complicated plan for the sale which, he asserted, was dictated by his "source." The plan required Garcia to give the $770,000 to Messina who would pass it on to a "mobile man" or intermediary to hold until the

transaction was complete. When Garcia balked at the idea of a middleman, Messina reassured him saying, "This man is a relative of mine, he is like my brother."

Two days later, in a Fort Lee restaurant, Garcia suggested a counter-proposal under which another DEA agent, portrayed by Garcia as his wife, would hold the money and stay with the mobile man until the deal was consummated. On April 7, at yet another meeting, Messina said he would float that proposal by his primary source "right now, because he lives a couple of blocks from here." Messina then drove from the restaurant to Cicale's apartment and spent an hour there. The next day at another lunch meeting in Fort Lee, Messina told Garcia that his source had rejected the new plan. He agreed, however, to raise it once again and said, "I'll talk to the guy. He's waiting for me, so let me go, and I am going to pick him up right now at the restaurant where he is at." Messina left and drove to a local restaurant where Cicale was waiting for him.

The following evening, April 9, Messina met DeSimone and Spector and leaving them at a Fort Lee shopping mall, proceeded on to a meeting with Agent Garcia. There, Messina explained that both the source and the mobile man had absolutely refused to do business with Garcia's "wife" and suggested as another alternative a series of smaller purchases. Messina agreed to meet Garcia the next day and said that if Garcia decided he was still interested in the deal, Messina would see his source and arrange the transaction for that day, April 10.

On April 10, Messina, Cicale and Spector were arrested and, three days later, DeSimone was also arrested.

## DISCUSSION

1. *Error in the Geaney Finding*

▉ Appellants Cicale, Spector, and DeSimone all claim that the non-hearsay evidence of their participation in the heroin distribution conspiracy was insufficient to establish their membership in the conspir-

acy. Accordingly, they assert, the admission into evidence under Fed.R.Evid. 801(d)(2)(E)—the co-conspirator exception to the hearsay rule—of Messina's various statements to Agent Garcia was improper. It is clear that statements by persons alleged to be co-conspirators may be considered by the jury only if the trial court is satisfied by a fair preponderance of the evidence that the defendant was in fact a member of the conspiracy. *United States v. Geaney,* 417 F.2d 1116, 1120 (2d Cir. 1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970). The standard for independent proof of participation is "lower than the standard of evidence sufficient to submit a charge of conspiracy to the jury," *United States v. Alvarez-Porras,* 643 F.2d 54, 57 (2d Cir.), *cert. denied,* 454 U.S. 839, 102 S.Ct. 146, 70 L.Ed.2d 121 (1981), and the proof may be "totally circumstantial," *United States v. Ragland,* 375 F.2d 471, 477 (2d Cir. 1967), *cert. denied,* 390 U.S. 925, 88 S.Ct. 860, 19 L.Ed.2d 987 (1968). Moreover, the trial court must view the evidence as a whole, rather than consider the individual pieces in isolation, *Geaney,* 417 F.2d at 1121; *United States v. Stanchich,* 550 F.2d 1294, 1300 (2d Cir. 1977) and, once a conspiracy has been proved to exist, the evidence needed " 'to link another defendant with it [for purposes of a *Geaney* finding] need not be overwhelming ...,' " *United States v. Provenzano,* 615 F.2d 37, 45 (2d Cir.), *cert. denied,* 446 U.S. 953, 100 S.Ct. 2921, 64 L.Ed.2d 810 (1980). Indeed, as this Court has noted on previous occasions, all that is required to meet the *Geaney* threshold is " 'a showing of a likelihood of an illicit association between the declarant and the defendant.' " *United States v. Alvarez-Porras,* 643 F.2d at 57 (quoting *United States v. Ragland,* 375 F.2d at 477).

### (a) *Cicale*

■ Appellant Cicale contends that the District Court erred in basing its *Geaney* finding as to Cicale on six statements by Messina. The statements in question were essentially of the same type: Messina indicated to Garcia that he was going to meet his source in order to obtain, or make arrangements to obtain, heroin and on each occasion, Messina was seen soon afterward with Cicale or arriving at Cicale's address.[2]

Cicale argues that such statements are inadmissible hearsay and, therefore, cannot be used even by the trial judge to make a *Geaney* finding. We disagree.[3] Under Fed.R.Evid. 803(3), hearsay statements reflecting a declarant's intentions or future plans are admissible to prove subsequent acts. Were Cicale's participation in these acts proven only by such hearsay statements, a difficult issue would arise since the legislative history of Rule 803(3) in the House indicates an intent to prevent use of a declarant's statements as to future intentions to prove the acts of a third person.

**2.** The six statements in question were as follows:

*January 15, 1981:*
"... he said he was going to talk to him right now ..."
*March 19, 1981:*
"I'll go talk to one of my sources ... He said he was going to go there as soon as he left me."
*March 23, 1981:*
" 'I'm going to drop by the guy's house that is providing this heroin the source of supply, right now ...' "
*March 25, 1981:*
"At that time, we entered conversations concerning as how the deal would go down or the delivery would be made, so he says 'Look, as soon as I finish eating I'm going to go over to the guy's house' ..."
*April 7, 1981:*
" 'I will go ahead and see them, you know, the primary source right now .... He just lives a couple of blocks from here ... I will go talk to him right now because he lives a couple of blocks from here ....' "
*April 8, 1981:*
" ' ... I'll talk to the guy. He's waiting for me so let me go, and I am going to pick him up right now at the restaurant where he's at.' "

**3.** As a consequence of the rationale we adopt, we need not decide whether Fed.R.Evid. 104(a) permits a *Geaney* finding based on hearsay which is inadmissible under the Federal Rules. Rule 104(a) specifically states the preliminary questions of admissibility are for the trial court and that it is not bound by exclusionary rules (other than privileges) in making that determination. Arguably, therefore, Messina's statements can be considered for *Geaney* purposes notwithstanding the hearsay rule.

This would force us to join the debate about the merit and present vitality of *Mutual Life Insurance v. Hillmon,* 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892). We need not enter that debate, however, which is fully explored in 4 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 803(3)[04]–[05] (1981),[4] for, while Messina's statements prove the nature of the transaction he was planning, Cicale's participation in that transaction is proven by independent evidence.

In *Hillmon,* one Walters had written that he was leaving Wichita on a trip with a man named Hillmon. This hearsay statement was used as the principal proof that Hillmon had actually traveled with Walters. Here, while Messina's statement indicates that he is about to engage in an illicit drug transaction involving another, Cicale's involvement is proven by independent non-hearsay evidence. That the nature of the transaction necessarily entailed the involvement of third parties surely does not limit use of Messina's statements to prove Messina's own acts. Statements by the declarant that he intends to carry out a plan are clearly admissible under 803(3), and, if a third party's participation is proven by independent evidence, the *Hillmon* issue does not arise. Rule 803(3) clearly allows the use of Messina's hearsay statements to show that he intended to engage in a transaction involving illicit drugs. Cicale's participation in that transaction is proven by eyewitness testimony. Even if the legislative history in the House accurately reflects Congressional intent, therefore, Messina's statements were properly used to support the *Geaney* finding.

In so holding, we stop well short of the limits on the use of such hearsay established by our previous decisions. On three separate occasions, we have declined to hold that *Hillmon* statements illuminate only the actions of the declarant. *United States v. Mangan,* 575 F.2d 32, 43 n.12 (2d. Cir.) *cert. denied,* 439 U.S. 931, 99 S.Ct. 320, 58 L.Ed.2d 324 (1978); *United States v. Moore,* 571 F.2d 76, 82 n.3 (2d Cir.1978); *Stanchich,* 550 F.2d at 1297–98 n.1. On several other occasions we have recognized that *Hillmon* allows the implication to be drawn from a declarant's statement that he had "relations" with the other persons implicated which made his criminal plan "feasible," thereby rendering such statements admissible "to show the existence of a conspiracy" from which a third party's participation may be inferred. *Stanchich,* 550 F.2d at 1297–98 n.1, *United States v. D'Amato,* 493 F.2d 359, 363 (2d Cir.), *cert. denied,* 419 U.S. 826, 95 S.Ct. 43, 42 L.Ed.2d 50 (1974), *United States v. Annunziato,* 293 F.2d 373, 377–78 (2d Cir.), *cert. denied,* 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 1348 (1961).

Cicale's own behavior, moreover,—his numerous conversations and meetings with Messina, *United States v. DiPalermo,* 606 F.2d 17 (2d Cir. 1979), *cert. denied,* 445 U.S. 915, 100 S.Ct. 1274, 63 L.Ed.2d 599 (1980), his meetings with Messina at "critical junctures of the conspiracy," *United States v. Calabro,* 449 F.2d 885, 889 (2d Cir. 1971), *cert. denied,* 405 U.S. 928, 92 S.Ct. 978, 30 L.Ed.2d 801 (1972), his evasive driving on the nights of March 17 when he met Messina at the Tre Amici Restaurant and on March 22 after he and Messina met in East Harlem, *D'Amato,* 493 F.2d at 362, 365, his encoded conversations warning Messina not to "misshoot"—also connect him to the conspiracy for *Geaney* purposes. Messina's statements are thus supported by a "ring of reliability." *United States v. Cirillo,* 499 F.2d 872, 885 (2d Cir.), *cert. denied,* 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974). As we stated in *Stanchich:*

> The mathematical chances that anyone not having an interest in [the conspiracy] would have engaged in the amount and nature of hovering and covering that [Ci-

---

4. While the Report of the House Judiciary Committee concerning Rule 803(3) (H.R.Rep. No.650, 93rd Cong., 1st Sess. (1973), *reprinted in* 1974 U.S.Code Cong. & Ad.News 7051, 7075) purports to limit the *Hillmon* doctrine to the declarant's own future conduct, some commentators, *e.g.,* J. Weinstein & M. Berger, 4 *Weinstein's Evidence* ¶ 803(3)[04] (1981), prefer McCormick's flexible rule which allows a statement of intent to function as part of a "larger matrix of circumstantial evidence."

cale] did are infinitessimal. Judges are not required to exhibit a naivete from which ordinary citizens are free.

550 F.2d at 1300.

#### (b) *DeSimone*

DeSimone's actions provided abundant evidence that he had participated in the conspiracy to distribute heroin. On October 29, 1980, minutes after receiving an orange plastic bag of quinine from Garcia, Messina picked up DeSimone who rode a few blocks and then got out, bag in hand. From the brevity of the contact, it could be inferred that the sole purpose of the meeting was to transfer the quinine as part of the ongoing conspiracy. *See United States v. Sisca,* 503 F.2d 1337, 1343 (2d Cir.), *cert. denied,* 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974). Moreover, Messina's statement that he was taking the quinine to his "man" and his later representation that his mobile man was a relative are admissible, in the context of other circumstantial evidence, to show DeSimone's participation in the conspiracy under the rationale outlined above as to Cicale. Indeed, DeSimone's own unguarded statement to Mrs. Messina that he was "working on a few deals" could reasonably be presumed to refer to illicit narcotics traffic, particularly since Mrs. Messina hastened to cut him off with a joke, doubtless to protect against the presence of the electronic surveillance which her husband suspected. Like Cicale, DeSimone acted furtively, *United States v. Gentile,* 530 F.2d 461, 465 (2d Cir.), *cert. denied,* 426 U.S. 936, 96 S.Ct. 2651, 49 L.Ed.2d 388 (1976), met with Messina at critical junctures in the conspiracy, *United States v. Calabro,* 449 F.2d at 889–90, and was in frequent association with other members of the conspiracy. This was more than sufficient to permit the trial court to infer that there was a "likelihood of illicit association" between Messina and DeSimone, *United States v. Alvarez-Porras,* 643 F.2d at 57 (quoting *United States v. Ragland,* 375 F.2d at 477), and that the *Geaney* threshold was met.

#### (c) *Spector*

Spector similarly questions the trial court's *Geaney* finding. Although Spector was in less frequent contact with Messina than the other conspirators, he too had discussions with Messina at the most critical junctures of the conspiracy. *United States v. Calabro,* 449 F.2d at 889. This included the weekend of March 14 and 15 when Messina was attempting to secure one-eighth of a kilogram of heroin for Garcia. During that weekend, Spector said to Messina on the telephone, "that thing is not, is a little bit of a problem," words a jury might find are the "vague euphemisms and jargon [used by narcotics dealers] to describe their contraband," *United States v. DeSist,* 384 F.2d 889, 894 (2d Cir. 1967). Throughout the next few days, Spector met with Messina either directly before or directly after Messina's meetings with Garcia. Moreover, Spector used vague language and code words to designate his meeting places with Messina. As a final corroborating circumstance, Spector had on his person, at the time of his arrest, a piece of paper with the notation "John Mess 5,000" along with several other numbers. This could have been construed as a record of the criminal enterprise, be it division of profits or an account of monies owed. Based on this substantial evidence, Judge Conner properly admitted Messina's statements against Spector as those of a co-conspirator.

### 2. *Sufficiency of the Evidence*

Appellants challenge the sufficiency of the evidence supporting their convictions. Cicale argues that, even with the admission of Messina's hearsay statements, the total evidence did not support the jury's verdict. DeSimone and Spector, however, both urge the inadmissibility of Messina's statements and assert that once these are stricken from the record, the remaining evidence does not justify a finding of guilt. We have already held that Messina's statements are admissible. Those statements, taken in conjunction with the other evidence discussed in connection with the *Geaney* finding, are more than sufficient to meet the familiar

standard of *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), that "[t]he verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the government to support it."

### 3. *Right to Counsel*

Cicale contends that he was denied the right to retain counsel of his own choice when the District Court refused to postpone the trial to a date when Cicale's lawyer, Gerald L. Shargel, was available. Cicale retained Shargel after his arrest and prior to his indictment on May 7, 1981. At a pretrial conference two weeks after the indictment was handed down, Judge Conner suggested that in view of the likelihood of pretrial motions, the earliest reasonable trial date—and the one he preferred—was early September. When Mr. Shargel informed the court that he would be tied up with another trial for the entire month of September, and Jay Goldberg, DeSimone's attorney, raised similar objections, the court set October 5 as the tentative trial date. On July 24, 1981, the court held a second pre-trial conference and again Mr. Shargel raised his September commitment, this time in response to Speedy Trial Act concerns on the part of another defendant who ultimately pled guilty. On September 4, in response to scheduling conflicts raised by Mr. Goldberg, Judge Conner pushed the trial date back eight days to October 13 and indicated, after Mr. Goldberg sought still more time, that this was a firm date.

Four weeks later, on October 2, Judge Conner was told by Mr. Shargel's associate that the other trial was going far slower than expected and would last another three weeks. When Judge Conner inquired if there were anyone else in the office who could try the case instead, the associate answered that he was the only other attorney in the office and not yet a member of the bar. Appellant Spector's attorney then raised a scheduling problem of his own, a trial set before Judge Pollack between October 23 and 26. Judge Conner's own calendar, as he announced at the conference,

held five cases set for October 26, four for the following Monday, three for November 9 and three for November 16. In addition, he was scheduled to sit on the Court of Appeals for the week of November 30. Faced with these conflicting demands, Judge Conner announced that no further delay could be granted and that if Shargel were unable to appear, Cicale should secure a new lawyer or accept court-appointed counsel.

On October 5, Cicale appeared personally to inform the court of his difficulties in obtaining counsel and again requested an adjournment. The court again refused to delay the case further. Cicale then retained counsel, Barry Scheck and Larry Vogelman, members of the Benjamin N. Cardozo Law School faculty. On October 13, at the beginning of the trial, Mr. Scheck moved for an adjournment explaining Mr. Shargel would be "the better lawyer." Nevertheless, he admitted each had spent three and a half days preparing with Cicale for trial and that they had received all of Mr. Shargel's plans and theories for the case.

■■■ While a criminal defendant has a right to counsel of his or her own choosing, *e.g., Powell v. Alabama*, 287 U.S. 45, 53, 53 S.Ct. 55, 58, 77 L.Ed. 158 (1932), exercise of that right must at times give way to the need for a fair and efficient administration of justice. As we have noted, "where the inability of retained counsel to serve gives promise of unreasonable delay or inconvenience in completing the trial, the court may require the defendant to secure other counsel." *United States v. Bentvena*, 319 F.2d 916, 936 (2d Cir. 1963) (citation omitted). The disposition of a request for a continuance is within the discretion of the trial judge and, absent abuse, the exercise of that discretion will not be disturbed. *Id.* at 935. Here, Judge Conner had to balance his own trial calendar and duties on the appellate court against the schedule of another judge as well as the interests of the original five defendants and their individual counsel. He had already yielded twice on his preferred choice of a trial date and had

accommodated these factors as best he could in what was admittedly a difficult situation for all concerned. *United States v. Burton,* 584 F.2d 485, 489 (D.C.Cir.1978), *cert. denied,* 439 U.S. 1069, 99 S.Ct. 837, 59 L.Ed.2d 34 (1979); *United States ex rel. Carey v. Rundle,* 409 F.2d 1210, 1214–15 (3d Cir. 1969), *cert. denied,* 397 U.S. 946, 90 S.Ct. 964, 25 L.Ed.2d 127 (1970). *Compare Linton v. Perini,* 656 F.2d 207 (6th Cir. 1981) (trial judge's refusal of defense counsel's request for a two to three week adjournment held unreasonable where the court scheduled trial for 10 days after arraignment on one count of kidnapping and four counts of rape) *cert. denied,* 454 U.S. 1162, 102 S.Ct. 1036, 71 L.Ed.2d 318 (1982). We hold there was no abuse of discretion in adhering to the trial schedule set.[5]

4. *Improper Comment on the Failure to Testify*

DeSimone asserts as error Judge Conner's remark in the course of an unrelated evidentiary ruling indicating that DeSimone intended to testify in his own behalf and could therefore clarify matters when he took the stand. When apprised of the fact that DeSimone did not and had never intended to testify, Judge Conner offered to give a curative instruction to the jury. After defense counsel ignored this suggestion and continued to argue another evidentiary issue, Judge Conner repeated his offer and asked DeSimone's counsel to advise him by the start of the next day's proceedings whether DeSimone wanted the curative instruction. The next morning, counsel declined the instruction, stating that he did not wish to call attention to the issue.

 In the context of a nearly two week trial, Judge Conner's single inadvertent remark does not constitute prejudicial commentary sufficient to deprive DeSimone of a fair trial. *United States v. Araujo,* 539 F.2d 287, 291 (2d Cir.), *cert. denied,* 429 U.S.

983, 97 S.Ct. 498, 50 L.Ed.2d 593 (1976); *see also United States v. Kaufman,* 429 F.2d 240, 246–47 (2d Cir.), *cert. denied,* 400 U.S. 925, 91 S.Ct. 185, 27 L.Ed.2d 184 (1970); *United States ex rel. D'Ambrosio v. Fay,* 349 F.2d 957, 961 (2d Cir.), *cert. denied,* 382 U.S. 921, 86 S.Ct. 301, 15 L.Ed.2d 235 (1965). In order to reverse a conviction for improper commentary on the right to remain silent, we must find that the comment was "manifestly intended or [was] of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. Araujo,* 539 F.2d at 291 (citation omitted); *United States v. Rochan,* 563 F.2d 1246, 1248–50 (5th Cir. 1977). Judge Conner did not intend to comment on DeSimone's failure to testify; in fact, he was under the mistaken impression that DeSimone actually planned to testify. Moreover, unlike the case upon which appellant relies, *Davis v. United States,* 357 F.2d 438 (5th Cir.), *cert. denied,* 385 U.S. 927, 87 S.Ct. 284, 17 L.Ed.2d 210 (1966), the trial court did not repeatedly refer to the defendant's failure to testify nor did it imply to the jurors that they might draw a negative inference from DeSimone's silence. Instead, Judge Conner carefully and explicitly twice charged the jury that the defendants have no burden of proof and that no inferences might be drawn from their failure to testify.

Affirmed.

ROBERT J. WARD, District Judge, concurring in part and dissenting in part.

Insofar as today's majority opinion affirms the convictions of appellants Frank DeSimone and Paul Spector, I concur.

I must dissent, however, from that portion of the majority opinion which holds that there was no error in the *Geaney* finding with respect to appellant Peter Cicale.

---

5. Cicale does not raise a claim of inadequate assistance of counsel. The record as a whole indicates that Messrs. Scheck and Vogelman, apprised as they were of Mr. Shargel's trial strategy and plans, were more than adequate to the task of Cicale's defense. The only claim of

prejudice raised is that his lack of confidence in trial counsel influenced his decision not to take the stand in his own defense. We cannot now reconstruct what might have happened had Mr. Shargel tried this case but this claim falls far short of a showing of actual prejudice.

The District Court based its *Geaney* finding as to Cicale on statements, by John Messina to DEA agent Eloy Garcia, which the District Court considered to be "verbal acts." For the reasons stated hereinafter, I view that finding as erroneous, and would remand for reconsideration of the issue.

1. *Messina's statements to Garcia were not "verbal acts."* A "verbal act" is a statement which, *irrespective of its truth or falsity*, has legal significance, or which, *irrespective of its truth or falsity*, explains the legal significance of an otherwise ambiguous act. Thus, statements of intention, such as those at issue here, may qualify as verbal acts, but only where the defendant's *actual* intention is legally immaterial and where his *expressed* intention is legally decisive. In such a case, the words are not offered for their truth, but merely to show the fact of their expression, because the words are legally significant or give legal significance to ambiguous non-verbal conduct regardless of whether they are true. "This situation must be differentiated from the case where words which clarify an ambiguous situation are relevant only because they are offered for their truth." 4 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 801(c)[01], at 801–69 (1981).

The instant case falls squarely in the latter category. The Government contends that the meetings between Messina and Cicale evidence Cicale's participation in the conspiracy. However, given the long-standing friendship between Messina and Cicale, and also Messina's contacts with numerous other drug dealers in the New York area, the Messina-Cicale meetings are not significantly probative of Cicale's participation in the conspiracy unless viewed in conjunction with Messina's prior statements to the effect that "I am now going to meet my source." The key point is that Messina's prior statements only give additional probative value to the subsequent meetings to the extent Messina's prior statements were true. That is, Messina's prior statements could properly be characterized as verbal acts only if, upon viewing the Messina-Cicale meetings in conjunction with these statements, one were able to conclude that the probative value of the Messina-Cicale meetings with respect to Cicale's participation in the conspiracy does not vary depending on whether Messina's prior statements are thought to be true or false. Plainly, such a conclusion would be absurd; indeed, at oral argument the Government declined to urge that the Court take this view. To my mind, however, any application of the "verbal act" doctrine to the six statements in question would have to be predicated on this untenable conclusion.

This reasoning is entirely consistent with the law of the Circuit. In *United States v. D'Amato*, 493 F.2d 359, 364–65 (2d Cir.), *cert. denied*, 419 U.S. 826, 95 S.Ct. 43, 42 L.Ed.2d 50 (1974), this Court held that a co-conspirator's statement that he was going to meet "his people" was "inadmissible hearsay" for the purpose of determining whether the *Geaney* standard had been satisfied as to a defendant with whom the co-conspirator met after making the statement. In *United States v. Stanchich*, 550 F.2d 1294, 1298 n.1 (2d Cir. 1977), this Court described *D'Amato's* analysis in this regard as "unquestionably correct." Moreover, *United States v. Manfredi*, 488 F.2d 588, 596 (2d Cir. 1973), *cert. denied*, 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974), does not call for a contrary result. To be sure, in that case this Court held that a co-conspirator's statement that he was going to meet his "friend" was properly considered by the trial judge in determining whether the *Geaney* standard had been satisfied as to a given defendant whom the co-conspirator subsequently met. *Manfredi's* holding has subsequently been explained by this Court as based, not on the "verbal act" theory, but rather on the ground that this hearsay had a "ring of reliability" which, under the circumstances, warranted its consideration for *Geaney* purposes. *United States v. Cirillo*, 499 F.2d 872, 885 (2d Cir.), *cert. denied*, 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974). No such "ring of reliability" exists here. The record is replete with instances where Messina bragged about his "sources" and their ability to supply heroin, many of which proved utterly false.

*2. Messina's statements to Garcia were not admissible against Cicale under Rule 803(3).* The majority concludes that Messina's six statements to Garcia, while hearsay, were admissible against Cicale under Rule 803(3), and hence were properly considered by Judge Conner in making his *Geaney* finding as to Cicale.[1] I disagree. I accept the proposition that hearsay which is admissible against a defendant under an exception to the hearsay rule other than the co-conspirator exception may properly be considered by the trial judge in making his *Geaney* finding as to that defendant. *United States v. Cambindo Valencia,* 609 F.2d 603, 635 (2d Cir. 1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980). However, Rule 803(3) makes declarations of intention admissible to prove only the *declarant's* future conduct, and not (as had been allowed, prior to the adoption of the Federal Rules of Evidence, under the doctrine set forth in *Mutual Life Insurance Co. v. Hillmon,* 145 U.S. 285, 295–300, 12 S.Ct. 909, 912, 914, 36 L.Ed. 706 (1892)) to prove the future conduct of another person.[2] *United States v. Jenkins,* 579 F.2d 840, 843 (4th Cir.), *cert. denied,* 439 U.S. 967, 99 S.Ct. 458, 58 L.Ed.2d 427 (1978); *United States v. Layton,* 549 F.Supp. 903 (N.D.Cal.1982); *see* H.R.Rep.No.650, 93d Cong., 1st Sess. (1973) ("the Committee intends that [Rule 803(3)] be construed to limit the doctrine of *Mutual Life Insurance Co. v. Hillmon,* 145 U.S. 285, 295–300, 12 S.Ct. 909, 912–914, 36 L.Ed. 706 (1892), so as to render statements of intent by a declarant admissible only to prove his future conduct, not the future conduct of another person"), *reprinted in* [1974] U.S. Code Cong. & Ad.News 7075, 7087. Under Rule 803(3), then, while Messina's six statements to Garcia were arguably admissible, with a limiting instruction, against Messina (*but cf. United States v. Kaplan,* 510 F.2d 606, 610–11 (2d Cir. 1974)), they remained inadmissible hearsay as to Cicale. Accordingly, Rule 803(3) provides no basis for a holding that Judge Conner properly took Messina's statements into account in making his *Geaney* finding with respect to Cicale.

*3. An appellate court may not review the "real" independent evidence and make its own Geaney finding.* In affirming Cicale's conviction, the majority has determined to (1) disregard the six statements erroneously relied upon by Judge Conner, (2) look instead at the "real" independent evidence against Cicale, and (3) conclude that this evidence satisfies the *Geaney* standard. I reject this approach. The *Geaney* finding is a question of fact for the trial judge, *United States v. Nixon,* 418 U.S. 683, 701 n.14, 94 S.Ct. 3090, 3104 n.14, 41 L.Ed.2d 1039 (1974); *United States v. Kaplan, supra,* 510 F.2d at 612, and is reviewed on appeal by inquiring merely whether the independent evidence of the defendant-appellant's participation in the conspiracy provided a "reasonable basis," *see United States v. Doulin,* 538 F.2d 466, 471 (2d Cir.), *cert. denied,* 429 U.S. 895, 97 S.Ct. 256, 50 L.Ed.2d 178 (1976), or "reasonable grounds," *see United States v. Green,* 523 F.2d 229, 233 n.4 (2d Cir. 1975), *cert. denied,* 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976), for the trial judge's factual finding of the requisite "likelihood" of the defendant's participation in the conspiracy. As a result, where (as here) the district judge has misapplied the *Geaney* standard, it is not for the appellate court to make its own *Geaney* finding upon properly applying the *Geaney* standard. *United States v. Ziegler,* 583 F.2d 77, 80–81 (2d Cir. 1978). In my view, this is particularly so where (as here) the record strongly indicates that the trial judge's *Geaney* finding would have differed

---

1. I observe that this theory was not urged by the Government either before the trial court or before us. The Government's decision not to rely on Rule 803(3) at any juncture of these proceedings stands, in my view, as eloquent proof of that rule's inapplicability to the facts of Cicale's case.

2. I recognize that this Court has, on three separate occasions, declined to rule whether Rule 803(3) limits the *Hillman* doctrine in this manner. *See United States v. Mangan,* 575 F.2d 32, 43 n.12 (2d Cir.), *cert. denied,* 439 U.S. 931, 99 S.Ct. 320, 58 L.Ed.2d 324 (1978); *United States v. Moore,* 571 F.2d 76, 82 n.3 (2d Cir. 1978); *United States v. Stanchich, supra,* 550 F.2d at 1297–98 n.1.

had he properly applied the *Geaney* standard. That is, the fact that Judge Conner thought it necessary to invoke the "verbal act" doctrine in order to find that the *Geaney* standard had been satisfied as to Cicale strongly indicates that he found the "real" independent evidence insufficient to support such a finding with respect to Cicale. "Able jurists like Judge [Conner] do not seek out complexities for nothing. We must go on the premise that the [other] evidence failed to supply him with assurance sufficient to justify [finding that *Geaney* had been satisfied as to Cicale]." *United States v. Kaplan, supra,* 510 F.2d at 613. In short, today's decision is nothing less than an unjustified exercise in appellate fact-finding that results in two votes for a verdict of guilt by association.

On the basis of the foregoing, I would remand this action insofar as Cicale is concerned, so that Judge Conner could make a *Geaney* finding as to Cicale without considering the six statements by Messina to Garcia. If he were to find that the *Geaney* standard has been satisfied as to Cicale, his decision would be subject to appellate review under the principles previously stated. If, on the other hand, he were to find that the *Geaney* threshold has not been crossed, Judge Conner would then have to reconsider Cicale's Rule 29 motion and either dismiss one or both counts of the indictment with respect to Cicale (if he were to grant the motion with respect to one or both counts) or order a new trial as to Cicale (if he were to deny any part of the motion).

Accordingly, I dissent from that portion of the majority opinion which holds that there was no error in the *Geaney* finding with respect to appellant Cicale.