**UNITED STATES of America**

v.

**Mariano INGOGLIA, Defendant.**

**No. 82 CR 0762 (CBM).**

United States District Court,
S.D. New York.

March 31, 1983.

John S. Martin, Jr., U.S. Atty. by James B. Rather, Asst. U.S. Atty., New York City, for U.S.

Anthony V. Lombardino, Kew Gardens, N.Y., for defendant.

## OPINION

MOTLEY, Chief Judge.

Mariano Ingoglia (Ingoglia) was tried before this court on one count of conspiracy to violate 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(A) and one count of distribution or possession with intent to distribute heroin in violation of 21 U.S.C. §§ 821, 841(a)(1) and 841(b)(1)(A) on March 21–23, 1983.[1]

At the close of the Government's case, Ingoglia moved for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a). Ingoglia contended that there was no direct evidence of his involvement in the crimes charged, and that a certain hearsay statement attributed to defendant and alleged co-conspirator Francisco Solimene (Solimene)[2] was inadmissible as against Ingoglia, because there was insufficient evidence independent of the hearsay statement to link Ingoglia to the alleged conspiracy. On March 22, 1983, the court denied Ingoglia's motion on the record and found that the statement attributed to Solimene could be submitted to the jury.[3] In this opinion, the court will amplify its ruling on Ingoglia's contentions with respect to the hearsay statement.

> [T]he judge must determine, when all the evidence is in, whether in his view the prosecution has proved participation in the conspiracy, by the defendant against whom the hearsay is offered, by a fair

---

**1.** Francisco Solimene and Albert LaRocca were also named as defendants in the indictment. LaRocca pled guilty to two counts of the indictment prior to trial, and Solimene was a fugitive at the time of trial.

**2.** The statement was testified to by Drug Enforcement Administration Special Agent Gerald Franciosa, as follows:

> Mr. Solimene explained to me that he had spoken to his guy and the guy said that his connection was coming at 10:00 o'clock and that everything would be okay.

Transcript (Tr.) at 37. The Government's contention was that LaRocca was Solimene's "guy," and that Ingoglia was LaRocca's "connection."

**3.** *See* Tr. at 168–78.

preponderance of the evidence independent of the hearsay utterances.

*United States v. Geaney,* 417 F.2d 1116, 1120 (2d Cir.1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970). This determination is commonly known as a *Geaney* finding.

The court found that the Government in this case had introduced sufficient evidence of Ingoglia's involvement in the alleged conspiracy independent of the statement attributed to Solimene to satisfy the *Geaney* standard. On the basis of the court's findings, the statement was admitted for consideration by the jury.

The following is a summary of pertinent testimony elicited by the Government at trial from three agents of the Drug Enforcement Administration (DEA).

Special Agent (Agent) Gerald Franciosa testified that he negotiated with Solimene to purchase one-eighth of a kilogram of heroin for $31,000.[4] (Tr. at 34.) At about 7:30 p.m. on the night of August 4, 1982, Agent Franciosa met Solimene at the Latineers Club, a private social club located at the corner of Broome and Mott Streets in downtown Manhattan. (Tr. at 34–35, 38.) After about forty-five minutes, Solimene and Agent Franciosa left the club, and proceeded on foot to a restaurant on Kenmare Street. (Tr. at 35–36.) The two ordered dinner at the restaurant.

During the course of the meal, Solimene told Agent Franciosa that Solimene's "guy" had said "[the 'guy's'] connection was coming at 10:00 o'clock and that everything would be okay." (Tr. at 37.)[5] Solimene and Agent Franciosa left the restaurant at approximately 9:00 or 9:30 p.m., and went to a coffee shop called the Cafe Roma, which was located on the same block as the Latineers Club (the Latineers Club was at the corner of Broome and Mott, and the Cafe Roma was at the corner of Broome and Mulberry). (Tr. at 38.) After a short period of time, Solimene told Agent Franciosa to wait in the cafe, that Solimene was "going to see the guy." (Tr. at 39.) Solimene informed the agent that he was "going to get the heroin." (*Id.*)

Agent Franciosa testified that he and Solimene then left the cafe. Agent Franciosa waited at the corner of Mott and Broome. Solimene walked east on Broome, toward the Latineers Club. "Just as [Solimene] approached the Latineers . . . Club," he . met with defendant Albert LaRocca (LaRocca). (Tr. at 40.) Solimene and LaRocca conversed for about five minutes, and then both entered the Latineers Club. (*Id.*) Agent Franciosa then re-entered the Cafe Roma. About fifteen minutes later, Solimene rejoined Agent Franciosa at the cafe. (Tr. at 41.)

Solimene informed Agent Franciosa that "everything was okay, it will be maybe another ten minutes," because "Solimene's guy was waiting for his guy to come." (Tr. at 41.) Solimene and Agent Franciosa again left the Cafe Roma. Solimene returned to the Latineers Club, and Agent Franciosa waited on the corner. (Tr. at 42.)

"Shortly thereafter," Agent Franciosa observed LaRocca leaving the Latineers Club. LaRocca waited "on the sidewalk by the street." (Tr. at 42.) Franciosa testified that, at about 10:00 p.m., he observed Ingoglia pull up in front of the Latineers Club in a blue and white Lincoln Continental automobile.[6] He testified that LaRocca entered the car, which then pulled away, stopping at the corner for a red light. (Tr. at 42–43, 46.) As the car was stopped for the light, Agent Franciosa observed LaRocca seated in the back seat, "leaning over the front seat engaged in a conversation with the driver of the vehicle."[7] (Tr. at 44.)

---

4. Agent Franciosa was posing as a purchaser of narcotics for "customers on the West Coast." Tr. at 36.

5. *See also* n. 2, *supra.*

6. The vehicle, which will be referred to as "the . Lincoln Continental," was stipulated by the parties to be registered to Elena Ingoglia, the defendant's wife. Tr. at 109.

7. Special Agent Arthur W. Reed also testified to witnessing this meeting between Ingoglia and LaRocca. Agent Reed stated that LaRocca "spoke briefly to the driver" before entering the Lincoln Continental. Tr. at 87.

Agent Franciosa identified Ingoglia as the driver. (Tr. at 45–46.) There was an unidentified passenger in the car, in addition to LaRocca and Ingoglia. (Tr. at 44.) Agent Franciosa then testified that, as he stood on the streetcorner looking at the car, Ingoglia "turned around and looked directly at me," for about fifteen seconds. (Tr. at 44–45.) Agent Franciosa testified that he went back into the Cafe Roma after the Lincoln Continental pulled away. (Tr. at 46.)

Special Agent (Agent) Arthur W. Reed testified that he was on duty "approximately at Broome Street and Mott." (Tr. at 83.) At about 10:30 p.m., he observed the Lincoln Continental return to the Latineers Club. LaRocca existed the car, and went directly into the club. (Tr. at 88.) According to Reed, the time period between the arrival of the Lincoln Continental at the Latineers Club and its return to the club was about twenty or twenty-five minutes. (Id.) About "five to ten minutes later," Agent Reed saw Solimene leave the Latineers Club and walk in the direction of the Cafe Roma. (Tr. at 89.)

Agent Franciosa testified that Solimene then rejoined him in the Cafe Roma and said: "Let's go. Everything is okay." (Tr. at 47.) Solimene and Agent Franciosa left in the Agent's car for a DEA undercover apartment on 170th Street in Manhattan, so that the narcotics could be tested before payment was made. (Tr. at 47–48.)

When they reached 170th Street, Solimene removed a package containing the narcotics from under his shirt. Solimene remained downstairs, and Agent Franciosa took the package up to the apartment to test the substance. (Tr. at 50.) Agent Franciosa testified that, after the heroin had been tested, he and Solimene returned to the Agent's car. "As soon as [they] got into the car," Agent Franciosa gave Solimene $31,000 in cash. The money was in "small bills," and packaged in a shoe box, which was in turn encased in a light-colored

plastic bag. (Tr. at 54, 52.) Solimene removed $2,500 from the box (which was his prearranged commission for the transaction), "closed the box and put it between his legs for the ride down to New York." (Tr. at 54.)

Agent Reed testified that, at about 11:00 p.m., LaRocca exited the Latineers Club and walked back and fourth from the club to the intersection of Mott and Broome looking up and down the street, and looking at his watch. After about one-half hour had passed, the Lincoln Continental again pulled up in front of the Latineers Club. "Mr. LaRocca ... walked over to the Lincoln, ... and spoke briefly with the driver." (Tr. at 89–90.)

Solimene and Agent Franciosa returned to the area of Mulberry and Broome Streets at about midnight. Solimene then met LaRocca on Broome Street, where LaRocca took possession of the plastic bag containing the shoebox of money. Solimene and LaRocca then entered the Latineers Club. (Tr. at 55–57.)[8]

There was testimony from Agent Reed that, five minutes after Solimene and LaRocca entered the club, LaRocca exited the club and threw a light-colored plastic bag into a trash can in front of the club. "Almost simultaneously," the Lincoln Continental was observed passing the corner of Mott and Broome. (Tr. at 91–92.) LaRocca then walked toward the corner, "and made a right turn in the same direction as the ... Lincoln Continental...." (Tr. at 92.)

Special Agent Daniel Pavichevich was stationed in a taxicab on the east side of Mott Street, "just out of Broome." (Tr. at 104.) He testified that he observed the Lincoln "pull in ... about three cars behind me, and park on the same side of the street." Ingoglia got out of the car, and met with LaRocca on the west side of the street. Ingoglia was observed "put[ting] his arm around" LaRocca. The two then went back to the car. LaRocca entered the back seat, and Ingoglia entered the driver's

---

**8.** Agent Reed also observed the transfer of the bag from Solimene to LaRocca, as well as their entrance into the Latineers Club. Tr. at 91.

side of the car. The car then departed. (Tr. at 104–105.)

*Discussion*

The Second Circuit recently summarized the standards required to be met on a *Geaney* finding:

> The standard for independent proof of participation is 'lower than the standard of evidence sufficient to submit a charge of conspiracy to the jury,' *United States v. Alvarez-Porras,* 643 F.2d 54, 57 (2d Cir.), *cert. denied,* [454 U.S. 839, 102 S.Ct. 146, 70 L.Ed.2d 121 (1981)], and the proof may be 'totally circumstantial,' *United States v. Ragland,* 375 F.2d 471, 477 (2d Cir.1967), *cert. denied,* [390 U.S. 925, 88 S.Ct. 860, 19 L.Ed.2d 987 (1968)]. Moreover, the trial court must view the evidence as a whole, rather than consider the individual pieces in isolation, *Geaney,* 417 F.2d at 1121; *United States v. Stanchich,* 550 F.2d 1294, 1300 (2d Cir.1977) and, once a conspiracy has been proved to exist, the evidence needed ' "to link another defendant with it [for purposes of a *Geaney* finding] need not be overwhelming ...," ' *United States v. Provenzano,* 615 F.2d 37, 45 (2d Cir.), *cert. denied,* [446 U.S. 953, 100 S.Ct. 2921, 64 L.Ed.2d 810 (1980)]. Indeed, as this Court has noted on previous occasions, all that is required to meet the *Geaney* threshold is ' "a showing of a likelihood of an illicit association between the declarant and the defendant." ' *United States v. Alvarez-Porras,* 643 F.2d at 57 (quoting *United States v. Ragland,* 375 F.2d at 477).

*United States v. Cicale,* 691 F.2d 95, 103 (2d Cir.1982) (emphasis supplied).

In *Cicale,* the district court had based its *Geaney* finding as to defendant Cicale on six statements made by an alleged co-conspirator. "The statements in question were essentially of the same type: [the alleged co-conspirator] indicated to [an undercover agent] that he was going to meet his source in order to obtain, or make arrangements to obtain, heroin and on each occasion, [the alleged co-conspirator] was seen soon afterward with Cicale or arriving at Cicale's address." 691 F.2d at 103 (footnote omitted). The district court found the statements to be sufficient under *Geaney* as "verbal acts." *See id.* at 108 (Ward, D.J., dissenting).

The Second Circuit affirmed, finding, however that Cicale's involvement had been proven "by independent non-hearsay evidence." *Id.* at 104. The court held that the alleged co-conspirator's statement could be used to show his own intention to engage in a narcotics transaction, and that Cicale's participation in that transaction was proven by eyewitness testimony. *Id.* The court found that Cicale had had "numerous conversations with [the alleged co-conspirator];" that he met with him "at 'critical junctures of the conspiracy' " (quoting *United States v. Calabro,* 449 F.2d 885, 889 (2d Cir.1971), *cert. denied,* 405 U.S. 928, 92 S.Ct. 978, 30 L.Ed.2d 801 (1972)); that he engaged in evasive driving; and that he had "encoded conversations" with the alleged co-conspirator. *Id.* Cicale's actions were held to support the alleged co-conspirator's statements with "a 'ring of reliability' " (quoting *United States v. Cirillo,* 499 F.2d 872, 885 (2d Cir.), *cert. denied,* 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974)). *Id.*

In the instant case, Ingoglia's actions as established by eyewitness testimony showed "a likelihood of an illicit association between [Solimene] and [Ingoglia]," [9] and supported Solimene's statement with a "ring of reliability." [10]

The agents testified that Ingoglia met with LaRocca in Ingoglia's car at approximately 10:00 p.m. on the night of August 4, 1982, prior to the transfer of the heroin from Solimene to Agent Franciosa. Later, while Solimene and Agent Franciosa were in the course of their journey to and from the apartment on 170th Street, Ingoglia

---

**9.** *United States v. Ragland,* 375 F.2d 471, 477 (2d Cir.1967), *cert. denied,* 390 U.S. 925, 88 S.Ct. 860, 19 L.Ed.2d 987 (1968); *see also Cicale,* 691 F.2d at 103.

**10.** *See Cicale,* 691 F.2d at 104.

returned to the Latineers Club in his car and had a brief conversation with LaRocca, who had been waiting outside the club. Ingoglia again met with LaRocca after Solimene and Agent Franciosa had returned from the apartment, and after LaRocca had received the money from Solimene. Ingoglia was observed to put his arm around LaRocca, and both entered Ingoglia's car. Agent Franciosa also testified that, after Ingoglia picked LaRocca up for the 10:00 p.m. meeting, Ingoglia turned around and looked directly at Agent Franciosa for fifteen seconds, while waiting for a light to change.

The meetings between Solimene and LaRocca observed by the agents established sufficiently that LaRocca was Solimene's "guy." Eyewitness testimony indicated that Ingoglia met with LaRocca before, during and after the transaction of heroin. The meetings between Ingoglia and LaRocca thus occurred at "critical junctures of the conspiracy." *United States v. Calabro,* 449 F.2d 885, 889 (2d Cir.1971), *cert. denied,* 405 U.S. 928, 92 S.Ct. 978, 30 L.Ed.2d 801 (1972). *See also Cicale,* 691 F.2d at 104.

The court found the evidence in the instant case to be similar to that at issue in *Calabro, supra.* There, as here, there was no direct evidence of defendant Calabro's participation in the conspiracy. There was, however, evidence that Calabro was present "or in close proximity" on almost every occasion on which undercover agents met with the co-defendants to discuss the sale of narcotics. 449 F.2d at 889. There was also testimony in that case that Calabro scrutinized the undercover agents. *Id.* at 889–90. Similarly, there was testimony in the instant case that Ingoglia scrutinized Agent Franciosa. As the Second Circuit stated in Calabro, this court is "entitled to infer that the purpose of this conduct on the part of [Ingoglia] was to assure himself that it was safe to do business with [Agent Franciosa]." *Id.* at 890.

The independent evidence in this case thus showed that Ingoglia met with LaRoc-ca at three separate, critical, junctures of the conspiracy. The evidence also showed that Ingoglia scrutinized Agent Franciosa. "[Ingoglia's meetings with LaRocca] and his attempting to assure himself of [Agent Franciosa's] trustworthiness constituted more than mere association with [LaRocca]." *Id.* Taken in conjunction,[11] this evidence "may justify an inference of complicity." *Id.*

The court found that a fair preponderance of the independent evidence showed a "likelihood of an illicit association between [Solimene] and [Ingoglia]." *Ragland,* 375 F.2d at 477. Ingoglia's behavior sufficiently connected him to the conspiracy for *Geaney* purposes. *Cf. Cicale* at 104. Solimene's statement, "thus supported by a 'ring of reliability,' "[12] was sufficiently connected to Ingoglia for consideration by the jury.

---

**11.** *Cf.* 449 F.2d at 890; *Cicale,* 691 F.2d at 103.

**12.** *Cicale,* 691 F.2d at 104 (citation omitted).